**816**

PUBLIC SERVICE COMMISSION OF the
STATE OF NEW YORK, Petitioner,

v.

FEDERAL POWER COMMISSION,
Respondent,

Skelly Oil Company, Sun Oil Company,
Callery Properties, Inc., Shell Oil Company, Pan American Petroleum Corporation, Superior Oil Company, Humble
Oil & Refining Company, W. S. Kilroy
et al., and Kilroy Properties, Inc., H. L.
Hawkins & H. L. Hawkins, Jr., Placid
Oil Company et al., Intervenors.

PUBLIC SERVICE COMMISSION OF the
STATE OF NEW YORK, Petitioner,

v.

FEDERAL POWER COMMISSION,
Respondent,

Monsanto Company, Mrs. James R.
Dougherty et al., W. A. Stockard et al.,
Edwin M. Jones Oil Company, Shell Oil
Company, H. D. Bruns & MPS Production Company, Continental Oil Company, Lamar Hunt, Intervenors.

LONG ISLAND LIGHTING COMPANY,
Petitioner,

v.

FEDERAL POWER COMMISSION,
Respondent,

Lamar Hunt, Mrs. James R. Dougherty
et al., W. A. Stockard et al., Edwin M.
Jones Oil Company, Intervenors.

CONTINENTAL OIL COMPANY,
Petitioner,

v.

FEDERAL POWER COMMISSION,
Respondent.

The SUPERIOR OIL COMPANY,
Petitioner,

v.

FEDERAL POWER COMMISSION,
Respondent.

Nos. 19796, 19800, 19919, 19941, 19957.

United States Court of Appeals
District of Columbia Circuit.
Argued June 27, 1966.
Decided Feb. 7, 1967.

Commission's order set aside and
case remanded to Commission for further proceedings.

Morton L. Simons, Washington, D. C., with whom Kent H. Brown, Albany, N. Y., was on the brief, for petitioner in Nos. 19796 and 19800.

Joseph C. Johnson, Houston, Tex., of the bar of the Supreme Court of Texas, pro hac vice, by special leave of court, with whom Bruce R. Merrill and Thomas H. Burton, Houston, Tex., were on the brief, for petitioner in No. 19941.

Homer J. Penn, Houston, Tex., for petitioner in No. 19957. Herbert W. Varner, Houston, Tex., and William T. Kilbourne, II, Washington, D. C., were on the brief for petitioner in No. 19957.

Joel Yohalem, Atty., F. P. C., with whom Richard A. Solomon, Gen. Counsel, and Howard E. Wahrenbrock, Sol., F. P. C., were on the brief, for respondent.

Sherman S. Poland, Washington, D. C., with whom Donald B. Robertson, Washington, D. C., was on the brief, for intervenor Skelly Oil Co. in No. 19796, argued on behalf of all intervenors.

Oliver L. Stone, New York City, was on the brief for intervenor Shell Oil Co.

Richard F. Generelly, Washington, D. C., was on the brief for intervenors Callery Properties, Inc., H. L. Hawkins, H. L. Hawkins, Jr., and Monsanto Co.

J. Evans Attwell, Houston, Tex., was on the brief for intervenor W. S. Kilroy and others.

James K. Schooler, Houston, Tex., was on the brief for intervenor Humble Oil & Refining Co.

Carroll L. Gilliam and Philip R. Ehrenkranz, Washington, D. C., were on the brief for intervenor Pan American Petroleum Corp.

Bernard A. Foster, Jr., and Donald B. Robertson, Washington, D. C., were on the brief for intervenors Mrs. James R. Dougherty and others, Edwin M. Jones Oil Co. and W. A. Stockard and others.

Morton L. Simons, Washington, D. C., and Bertram D. Moll, Mineola, N. Y., also entered appearances for petitioner in No. 19919.

Robert E. May, Washington, D. C., also entered an appearance for intervenor Sun Oil Co.

Robert W. Henderson, Dallas, Tex., also entered an appearance for intervenor Lamar Hunt.

Before BAZELON, Chief Judge, WILBUR K. MILLER, Senior Circuit Judge, and TAMM, Circuit Judge.

BAZELON, Chief Judge:

We are to review a Federal Power Commission (FPC) order certificating sales of natural gas from producers to interstate pipelines. The sales were certificated in the *Hawkins* (Texas Railroad District No. 3)[1] and *Sinclair* (Texas Railroad District No. 2)[2] proceedings, which are consolidated here.

The New York Public Service Commission challenges the certificates on three grounds. First, there was no showing of public need for the gas. Second, the "in-line" price was too high. And third,

---

1. H. L. Hawkins & H. L. Hawkins, Jr. (Operator), et al. Docket Nos. G–18077, et al.

2. Sinclair Oil & Gas Company, et al. Docket Nos. G–16760, et al.

the FPC erroneously postponed deciding whether the producers should be required to refund amounts in excess of the in-line level which were collected under a temporary certificate. Superior and Continental (producers) challenge the in-line price as too low. Superior claims also that the FPC set too high an interest rate on funds which would be retained by the producers in excess of the amount allowed by the permanent certificates. The intervenors support the FPC's determinations, although some of them think that the in-line price should have been higher.

## I

### The Public Need for the Gas

We face some confusion about whether New York properly raised the issue of public need. At the prehearing conference in the *Hawkins* proceeding, New York limited the issue to whether or not the *pipelines* needed the gas.[3] However, in its exceptions to the Examiner's initial decision New York said, "In view of (a) the absence of any evidence of public need for the gas and (b) the many indications that pipelines in the Gulf Coast area are presently suffering from take-or-pay problems,[4] the application should be denied."[5] This raised the issue of the *public's* need for the gas. New York used the take-or-pay problems to alert the FPC to a potentially harmful situation and obligate it to give reasons why,

in spite of those problems, the sales should be certificated.[6] New York reiterated its position in a petition for rehearing before the FPC.[7]

■ In *Sinclair,* New York raised the issue in the same terms as in the *Hawkins* proceeding.[8] And again, after the FPC refused to consider the issue, New York repeated its contentions in a petition for rehearing.[9] Since New York presented the issue of public need in its petition for rehearing in both the *Hawkins* and *Sinclair* proceedings, our review is authorized by Section 19(b) of the Natural Gas Act.[10]

The most obvious element of public necessity is the demand for the gas. In several cases decided before CATCO, the existence of an unsatisfied market was considered of great importance. For example, in Oklahoma Natural Gas Co. v. Federal Power Commission[11] the court allowed the need in the Chicago market to outweigh even considerations of the price of the gas. And in United Gas Improvement Co. v. Federal Power Commission,[12] because the demand for the gas was shown to be great, the court did not insist that the FPC regulate the initial price.[13]

■ Since these cases were decided, the Supreme Court has held, in *CATCO,* that the initial price is extremely important. But *CATCO* does not suggest that

---

3. H.A. (*Hawkins* Joint Appendix) 7–19.

4. New York claimed that the pipelines were obligated to take or pay for more gas than they could use. [Footnote added.]

5. H.A. 268.

6. This argument is analogous to the argument that the FPC must give reasons why a certificate should be granted even though the price is out of line. The out-of-line price alerts the FPC to the potentially harmful situation. See Atlantic Refining Co. v. Public Service Commission, 360 U.S. 378, 79 S.Ct. 1246, 3 L.Ed. 2d 1312 (1959) (CATCO).

7. H.A. 311–12.

8. S.A. (*Sinclair* Joint Appendix) 198.

9. S.A. 243–44.

10. 15 U.S.C. § 717r(b) (1964).

11. 103 U.S.App.D.C. 256, 257 F.2d 634, cert. granted, 358 U.S. 877, 79 S.Ct. 117, 3 L.Ed.2d 108 (1958), cert. dismissed, 358 U.S. 948, 79 S.Ct. 603, 3 L.Ed.2d 567 (1959).

12. 269 F.2d 865 (3d. Cir.), vacated *sub nom.* Public Service Commission v. Federal Power Commission, 361 U.S. 195, 80 S.Ct. 292, 4 L.Ed.2d 237 (1959).

13. See *also Department of Conservation* of State of La. v. Federal Power Commission, 148 F.2d 746 (5th Cir.), cert. denied 326 U.S. 717, 66 S.Ct. 22, 90 L.Ed. 424 (1945), in which the court allowed the need for the gas to outweigh evidence that the gas was going to be put to an inferior use.

the public's need for the gas is irrelevant. Indeed, the Court seems to have imposed on the producer the burden of proving public need before certification. In part, the Court reversed the Commission's certification in *CATCO* because there was no "support whatever in the record for the conclusory finding on which the order was based that 'the public served through the Tennessee Gas system is greatly in need of increased supplies of natural gas.'"[14]

■ But market demand is not the only relevant factor. In the *Transco* case,[15] the question was whether the FPC, "through its certification power, may prevent the waste of gas committed to its jurisdiction."[16] The Supreme Court said "no one [disputed] that natural gas is a wasting resource and that the necessity for conserving it is paramount."[17] The dispute was whether the "public convenience and necessity," referred to in § 7(e) of the Natural Gas Act, included considerations of conservation, or whether the FPC was precluded from considering that factor. In affirming the Commission's action, the Court decided that conservation was relevant to public convenience and necessity. *Transco* was a pipeline certificate case, and the instant case is a producer certificate case. But pipelines and producers are certificated under the same statute, and, at least without strong evidence, we should not say that conservation is relevant in one case and not in the other. The public's interest in conserving gas is no less when the applicant for a certificate of public convenience and necessity is a producer.

The parties do not explicitly deny the relevance of market demand and conservation, but we are asked to disregard the issue of public need for four other reasons. First, it was not properly raised below. We have already dealt with that argument. Second, the public need for the gas should be determined in a pipeline certificate or pipeline rate case, not in a producer certificate case. Third, the FPC can postpone consideration of public need until it completes its pending rule-making proceeding on the problem of take-or-pay contracts. And fourth, "because of the nature of the gas business and the obligation of pipeline companies to the consuming public, it is to be expected that such companies will occasionally have long-term contracts for supplies which will give them gas for future, even though the supplies may be slightly in excess of their present-day needs."[18] We will deal with the last three contentions in turn.

1. According to New York, the issue of public need should not be decided only in a pipeline certificate or rate case. New York argues that if the gas is sold to a pipeline which is unable to use it, and if the pipeline must either take the gas or pay for it nonetheless, then the loss sustained by the pipeline will be reflected in the price charged to the public utility and ultimately in the price charged to the consumer. The FPC could eliminate this problem by ruling that the pipeline's investment in the unused gas was "imprudent" and refusing to allow the pipeline to add its cost to the rate base. However, the FPC has cited no case in which the cost of unused gas was eliminated from the rate base. To the contrary, there is some indication that the FPC may be allowing at least part of the loss to be shifted to the consumer.[19] Indeed, it would seem difficult for the FPC first to certificate a sale to a pipeline and then to claim that the pipeline's investment in the gas was imprudent.

---

14. *Supra* note 6, 360 U.S. at 393, 79 S.Ct. at 1256.

15. Federal Power Commission v. Transcontinental Gas Corp., 365 U.S. 1, 81 S.Ct. 435, 5 L.Ed.2d 377 (1961).

16. *Id.* at 8, 81 S.Ct. at 439.

17. *Ibid.*

18. H.A. 280.

19. See United Gas Pipe Line Co., 31 FPC 1180, 1191–92 (1964), and United Gas Pipe Line Co., 32 FPC 1515, 1519 (1964).

■ Regardless of how the FPC uses its "imprudent investment" doctrine, there is another reason why the public's need for the gas must be considered in a producer certification. As we have indicated, the FPC must prevent waste of natural gas. One of the most important ways is to control and limit the end uses of gas.[20] The FPC must compare various uses and determine which ones are more economically necessary. If the proposed sale is to a consumer who will use the gas in an economically "inferior" way then the sale is not certificated. Of course, to do the job properly the FPC must consider all alternative uses.[21] It recognizes this responsibility in pipeline certificate cases.[22] But if it refuses to consider the issue in producer certificate cases and waits for pipeline cases, some of the alternatives will already have been eliminated. In the pipeline case the FPC can direct the gas towards one rather than another of the pipeline's customers but without considering the customers of other pipelines which might have bought the gas. Thus, the gas may go ultimately to consumers whose use will be less economically beneficial than the use of other potential purchasers.

■ Because the FPC refused to consider the issue of need, this record does not indicate whether or not this gas has been wasted.[23] However, such wasting is a possible result of the alleged oversupply situation of some of the pipelines here.[24] The possibility that gas may be wasted requires that the FPC determine the issue of need before the initial sale to a pipeline. Otherwise it may be too late to protect the public interest.[25]

■ 2. The FPC argues that "insofar as there may be any [take-or-pay] problem for [the pipelines in the instant case], it is one not peculiar to them and may therefore be resolved * * * by the Commission's reservation of the matter for consideration in the pending rule-making proceeding on that subject * * *."[26] As we have noted, though, the take-or-pay problem does not exhaust the considerations relevant to an informed decision about the public's need for the gas. It is unlikely that any decision the Commission makes in its rule-making proceeding would deal with the entire "need" issue. The rule-making proceeding on which the FPC relies has been pending for five and a half years,[27] and we do not know when a decision will be reached. We can only speculate about what that decision will be and how it will apply to the question of public need. We think such an uncertain proceeding should not excuse the Commission from its present responsibilities.[28]

20. Federal Power Commission v. Transcontinental Gas Corp., supra note 15, 365 U.S. at 8, 81 S.Ct. 435.

21. "[Section] 7(e) requires the Commission to evaluate all factors bearing on the public interest." Atlantic Refining Co. v. Public Service Commission, supra note 6, 360 U.S. at 391, 79 S.Ct. at 1255. [Emphasis added.]

22. Federal Power Commission v. Transcontinental Gas Corp., supra note 15.

23. We do not know whether anyone else could have taken the gas, or, if so, whether he served markets which would differ from the markets served by the pipelines here.

24. There is a suggestion that the gas involved in this case was obviously needed because some of it has already been consumed. The issue of need, however, is not decided simply because someone will consume the gas. The real questions are whether the consumer was forced, or will be forced, to pay more for the gas because of the pipeline's poor take-or-pay situation and whether the gas could have been put to a superior use.

25. See City of Pittsburgh v. Federal Power Commission, 99 U.S.App.D.C. 113, 237 F.2d 741 (1956).

26. Brief for Respondent, p. 29.

27. Docket No. R-199, 26 Fed.Reg. 4615 (May 22, 1961).

28. See Public Service Commission of State of New York v. Federal Power Commission, 117 U.S.App.D.C. 287, 292-293, 329 F.2d 242, 247-248, cert. denied sub nom. Prado Oil & Gas Co. v. Federal Power Commission, 377 U.S. 963, 84 S.Ct. 1644, 12 L.Ed.2d 735 (1964). A day before this

3. The FPC's last argument is that the "nature of the gas business and the obligation of pipeline companies to the consuming public" sometimes require a poor take-or-pay situation.[29] If this means that other considerations may outweigh the pipeline's poor take-or-pay situation, we agree. And these considerations may also outweigh the considerations of conservation inherent in the case. But there is no evidence in the record which indicates what these considerations are or how they are relevant to this certification. If public convenience and necessity requires this certification, this must appear from something more than the FPC's broad and unsupported statement about the "nature of the gas business" in a case where the FPC thought the issue irrelevant.[30]

Although we remand this case so that the FPC can consider the issue of public need, we recognize an obvious tension between the statutory requirement that it do so and administrative feasibility. The public convenience and necessity includes many considerations, but if there is to be any effective certification of producers the FPC must sometimes stop short of the ideal.[31] It is evident, too, that the FPC must have great latitude in its choice of procedures. We are not demanding that the FPC hold a long and complex hearing in each of its many producer application cases. But it does not seem too difficult to have the producer's customers or the pipeline's customers testify about the take-or-pay situation.[32] Regarding the broader aspects of the "nature of the gas business" or of conservation, the FPC may consider studies of its staff. It may, after study, issue policy statements. These studies or statements may be relevant to large geographic areas, or perhaps to the whole gas industry. Then it would not be necessary to relitigate need in each case; the FPC need only show that the broad statement or study covers the particlular certification before it. In short, we do not now prescribe any particular method for deciding need. Nor is our discussion of what public need means exhaustive. We decide only that when a party makes a non-frivolous claim that there is no public need for the gas the FPC must give considered reasons if it decides otherwise. Its decision must be made *before* it grants a permanent certificate to a producer.[33] "[A] certificate shall be issued * * * authorizing the * * * sale * * *

opinion was issued, we were informed that the FPC completed its rule-making proceeding on January 18, 1967. The new rule does not affect our decision to remand this case for a determination of public need. That rule is subject to further review. In any event, we think the FPC should decide, in the first instance, how the new rule relates to the issue of whether the public needs the gas involved in this case. Therefore, on the remand we order herein, the FPC will make that determination according to the principles stated in this opinion. See discussion following note 30 *infra.*

29. H.A. 280.

30. In*CATCO* the Supreme Court also rejected an unsupported statement about the public need. *Supra* note 6, 360 U.S. at 393, 79 S.Ct. 1246.

31. *Cf.* United Gas Improvement Co. v. Callery Properties, 382 U.S. 223, 86 S.Ct. 360, 15 L.Ed.2d 284 (1965). *Callery* does not apply directly though. There, no one doubted the need for the gas. The dispute was over the price. The longer it took to set the price, the more the consumer was hurt. Understandably, the Supreme Court wanted the Commission to act quickly and efficiently. The entire purpose of the Act is to protect the consumer. Here, New York claims that this sale should not be certificated at all, no matter at what price and no matter how quick the procedure. It is counter-productive to streamline procedure when the effect is to prevent the Commission from considering the possibility that the sale itself would not be in the public interest.

32. Or perhaps the Commission can rely upon a previously decided producer or pipeline certificate case if the decisions there are relevant to the applications pending before the Commission.

33. *Cf.* Federal Power Commission v. Texaco, Inc., 377 U.S. 33, 42–44, 84 S.Ct. 1105, 12 L.Ed.2d 112 (1964), and Federal Power Commission v. Hunt, 376 U.S. 515, 525–526, 84 S.Ct. 861, 11 L.Ed.2d 878 (1964).

if \* \* \* the proposed \* \* \* sale \* \* \* is or will be required by the present or future public convenience and necessity; otherwise such application shall be denied." [34]

## II

*The In-Line Price*

The second major dispute in this case concerns the FPC's determination of the in-line price. Since the *CATCO* decision, the FPC has been granting permanent certificates of public convenience and necessity only if the price of the gas is in-line. The question is, in line with what? Judging from these and other FPC proceedings, the "line" is determined as follows: First the Commission chooses a time period and a geographical area which it considers relevant [35] and lists all the prices at which gas was sold at that time and in that area. Then it eliminates prices which are "suspect" either because they are presently under litigation or Commission review or because they are similar to a price under a cloud.[36] When the price array is completed the FPC makes several calculations, for example, the average price, the median price, the weighted average price, and the price at which substantial volumes of gas flowed in interstate commerce. The FPC adjusts some of these prices by assigning differing weights to the various prices which form the price array. At least one Commissioner in our

case gave some weight also to a guideline price announced first in 1960 and subsequently revised.[37] The Commission considers these weights and the adjustments, and then picks a price.[38] Here the Commission set the in-line price at 15¢ per Mcf for District No. 2 during the period before the Policy Statement (September 28, 1960) and at 16¢ for the post-Policy Statement period.[39] For District No. 3, the prices were 16¢ and 17¢ respectively.

The petitioners have many disagreements with what the FPC did in this case. Continental and Superior think the Commission should have given more weight to certain 20¢ sales which were permanently certificated, to sales which were temporarily certificated, and to contract prices even before these prices are tested in any kind of certificate proceeding.[40] They also claim that the Commission erroneously considered certain sales at 14¢ and less, erroneously excluded intrastate sales, and erroneously used estimated rather than actual volumes when calculating weighted average prices. In short, they claim that the Commission acted arbitrarily and without any recognizable standards.

New York claims that the FPC should have given no weight to contract prices or to sales made pursuant to temporary certificates, and that it erroneously considered certain permanently certificated prices. New York says these perma-

---

34. 15 U.S.C. § 717f(e) (1964).

35. Here the area for the *Hawkins* proceeding was Texas Railroad District No. 3, and the area for the *Sinclair* proceeding was Texas Railroad District No. 2. In both proceedings there were two relevant time periods—in *Hawkins* from January 1, 1958, to September 28, 1960, (pre-Policy Statement period), and from September 28, 1960, to January 1, 1964, (post-Policy Statement period), and in *Sinclair* from January 1, 1957, to September 28, 1960, (pre-Policy Statement period), and from September 28, 1960, to March 10, 1964, (post-Policy Statement period).

36. See, *e. g.*, United Gas Improvement Co. v. Federal Power Commission, 283 F.2d 817 (9th Cir. 1960), cert. denied *sub nom.* Superior Oil Co. v. United Gas Im-

provement Co., 365 U.S. 879, 81 S.Ct. 1030, 6 L.Ed.2d 191 (1961).

37. See Commissioner Bagge's concurring opinion in *Hawkins.* H.A. 297.

38. The proceedings in this case provide some examples of the Commission's methods. See the appendix attached to this opinion.

39. The pre- and post-Policy Statement periods are described fully in note 35 *supra.*

40. Their claim that the Commission disregarded these prices cannot be based on the record in this case. See, *e. g.*, S.A. 226 and H.A. 285–86 quoted in the appendix *infra.* The producers' claim is reduced to the contention that not enough weight was given.

nently certificated prices were incorrectly determined and therefore should not be allowed to affect subsequent in-line prices.

To properly weigh these claims we must understand the purpose of in-line pricing.

*In-Line Pricing*

■ The concept of an in-line price is an artificial one created by the Supreme Court, the Courts of Appeals, and the Commission for the sole purpose of protecting the consumer. Before the concept existed, the FPC usually proceeded in the following way. A producer who wanted to sell gas in interstate commerce applied to the Commission for a certificate of public convenience and necessity under § 7 of the Act. When the certificate was granted, the producer-seller and the pipeline-buyer executed the sale at a price which they had already negotiated. If that price was too high, the FPC, either on its own motion or acting on the complaint of an interested party, could institute proceedings under § 5 of the Act to determine the "just and reasonable" price, after which the producer was forced to lower his price accordingly. However, since § 5 does not provide for refunds, the producer was allowed a "windfall" (with a consequent "squall" for the consumer) during the period between commencement of the sales and the conclusion of the hearing under § 5.[41] Section 5 hearings were long and complicated, and the windfall could be quite large. The ordinary protections of the market place did not exist in this regulated monopoly industry. The producer, of course, was interested in extracting the highest price from the buyer. But the buyer did not have an equal interest in keeping the price down because the price he paid became part of his rate base and was ultimately paid by the consumer.[42] Presumably the consumer did not have any choice except to buy the fuel at the price which was set.[43]

The procedure after the invention of in-line pricing changed in one significant way. Now, when the FPC grants a certificate of public convenience and necessity, a price condition is usually attached. A dissatisfied producer who wants to sell at a higher price can file a new rate schedule under § 4 of the Act subject to his contract with the pipeline.[44] These rates become effective after thirty days unless challenged by the FPC. Even if challenged, the new rates become effective after five months if the Commission has not completed its "just and reasonable" determination by that time. Eventually, then, the producer may charge whatever price he wants.[45] However, by filing under § 4, the producer becomes subject to payment of refunds if the FPC later finds that the price charged was not just and reasonable. In this way, the consumer is afforded at least some protection against excessive prices.[46]

*The Use of Contract Prices*

■ From the description of in-line pricing it is evident that the FPC cannot use the prices at which producers

---

41. Atlantic Refining Co. v. Federal Power Commission, *supra* note 6, 360 U.S. at 390, 79 S.Ct. 1246.

42. Atlantic Refining Company v. Federal Power Commission, 115 U.S.App.D.C. 26, 28 at n. 11, 316 F.2d 677, 679 at n. 11, (1963).

43. United Gas Improvement Co. v. Federal Power Commission, 290 F.2d 133, 135 (5th Cir.), cert. denied *sub nom.* Sun Oil Co. v. United Gas Improvement Co., 368 U.S. 823, 82 S.Ct. 41, 7 L.Ed.2d 27 (1961).

44. *Cf.* Texaco, Inc. v. Federal Power Commission, 290 F.2d 149, 156 (5th Cir. 1961).

45. The Commission may, however, impose a temporary moratorium on price increases. See United Gas Improvement Co. v. Callery Properties, *supra* note 31. A price moratorium was imposed in the instant case, but it is not before us on appeal.

46. The Act was so framed as to afford consumers a complete, permanent and effective bond of protection from excessive rates and charges. Atlantic Refining Co. v. Public Service Commission, *supra* note 6, 360 U.S. at 388, 79 S.Ct. 1246.

and pipelines contract as a basis for setting the price. The need for the FPC, and for a concept like in-line prices, arises primarily because the unregulated market place cannot protect the consumer adequately. Congress created the FPC to protect the consumer from the market place, not simply to reflect it. The Commission should not rely upon prices over which it has not exercised careful control.[47]

One Court of Appeals has viewed the Commission's reliance on contract prices as the reason for the *CATCO* opinion.

> [W]e perceive that most of the Commission's approach to the certification procedures, until stopped by the Supreme Court in *CATCO,* was subject to the [following] criticism * * *: that the Commission was permitting the initial filing prices to be fixed by the producers merely on a showing, *so far as price justification was concerned,* that they had been bargained for at arm's length, or that they were not higher than a price someone else was then paying in the area.[48]

And this court has been wary of allowing the Commission to avoid its responsibility by relying on prices negotiated in the market place.[49]

### The Use of Temporary Certificates and the Policy Statement

If the Commission relies on prices over which it has never exercised control, it effectively abdicates its responsibility to protect consumers. Although prices contained in temporary certificates are not completely without Commission control, neither are they subjected to thorough consideration. According to the statute, temporary certificates are granted only "in cases of emergency" pending determination of an application for a permanent certificate. Temporaries are granted in *ex parte* proceedings "without notice or hearing." [50] No record is made, so it is impossible for a court to know on what basis the Commission granted the certificate. Accordingly, standards on review are minimal. This court has upheld a temporary certificate although we admitted that the summary nature of the proceeding precluded us from passing intelligently upon the parties' contentions.[51]

Recently, though, the FPC has attempted to make temporary certification a more considered decision. In 1960 it promulgated a Policy Statement which included guideline prices beyond which it would not certificate sales, even temporarily. In theory, the Policy Statement could justify inclusion of temporary certificates in the permanent certificate price array, since the Policy Statement could provide some degree of intelligent control over temporary prices.

In fact, however, the Policy Statement has not had a curative effect. The FPC

---

**47.** See Atlantic Refining Company v. Federal Power Commission, *supra* note 42, 115 U.S.App.D.C. at 28, n. 11, 316 F.2d at 679, n. 11.

**48.** United Gas Improvement Co. v. Federal Power Commission, *supra* note 43, 290 F. 2d at 135–136. [Emphasis in the original.] See also United Gas Improvement Co. v. Federal Power Commission, 290 F. 2d 147, 148 (5th Cir.), cert. denied. *sub nom.* Superior Oil Co. v. United Gas Improvement Co., 366 U.S. 965, 81 S.Ct. 1926, 6 L.Ed.2d 1255 (1961).

**49.** Public Service Commission of State of New York v. Federal Power Commission, 109 U.S.App.D.C. 289, 291, 287 F.2d 143, 145 (1960), and Public Service Commission of State of New York v. Federal Power Commission, 109 U.S.App.

D.C. 292, 296, n. 4, 287 F.2d 146, 150, n. 4 (1960), cert. denied *sub nom.* Hope Natural Gas Co. v. Public Service Commission, 365 U.S. 880, 81 S.Ct. 1031, 6 L.Ed.2d 192 (1961).

**50.** 15 U.S.C. § 717f(c) (1964).

**51.** Public Service Commission of State of New York v. Federal Power Commission, 117 U.S.App.D.C. 195, 199, 327 F.2d 893, 897 (1964). See also American Liberty Oil Co. v. Federal Power Commission, 301 F.2d 15 (5th Cir. 1962). And see Public Service Commission of State of New York v. Federal Power Commission, *supra* note 28, 117 U.S.App.D.C. at 294, 329 F.2d at 249, in which this court characterized temporary certificates as being "without notice or hearing or mature consideration".

itself seems to give the Statement very little (and very ambiguous) weight. In its first statement, the FPC said that "these price levels * * * are for the purpose of guidance and initial action by the Commission and their use will not deprive any party of substantive rights." [52] When the State of Wisconsin petitioned this court to review the Policy Statement, the FPC moved for dismissal on the ground that the Policy Statement "does not modify the procedures under which certificates are granted. * * * It denies no rights and imposes no obligations." [53] We agreed and dismissed Wisconsin's petition for review.[54] The Commission has repeatedly held that the Policy Statement does "not purport to fix the 'in-line' price." [55] And recently the Commission characterized the guideline prices as being relevant only when "no protests or petitions to intervene [are] filed" in the certification proceeding.[56] In the instant case, only one Commissioner relied upon the guideline prices; two ignored them, and two felt that reliance upon the Policy Statement would be impermissible.

Further, we cannot know whether the guideline price actually controls temporary prices unless we know what the guideline price is based on. For example, it is conceivable that temporary certificates have significant influence upon the guideline price. If so, the guidelines do not control temporary prices. In any event, it is impossible to determine how the guidelines were set. The Commission listed a number of very general factors but was not specific about what the factors were or how they were considered. When asked, the FPC refused to disclose the basis for its determination.[57]

A still more persuasive reason for eliminating temporary prices from the permanent price array is the way their use may injure consumers. The effect may be a slow escalation of in-line prices: An in-line price is set; the guideline price is set somewhat higher; temporary certificates are granted at the guideline price; the new temporary certificates are used in determining a new in-line price, which will be higher than the first in-line price; the new in-line price raises the guideline price; and then the spiral begins again. Although, in fact, we cannot isolate so clearly the effect of the temporaries and the guidelines, there can be no doubt that an escalation has occurred, and in a manner similar to the process described.[58] This process con-

52. 24 FPC 818, 819 (1960).

53. Wisconsin v. Federal Power Commission, No. 16118 Motion to Dismiss, p. 2 (1961).

54. Wisconsin v. Federal Power Commission, 110 U.S.App.D.C. 260, 292 F.2d 753 (1961).

55. Amerada Petroleum Corp., 29 FPC 171, 172 (1963); Union Texas Petroleum, 29 FPC 273, 275 (1963); Union Texas Petroleum, 29 FPC 733, 734 (1963).

56. 30 Fed.Reg. 4670, 4671 (1965). See also Amerada Petroleum Corp., *supra* note 55, at 172 and Union Texas Petroleum, 29 FPC at 275 (1963).

57. See, *e. g.*, Nos. 7781, *et al.*, Sunray DX Oil Co. v. Federal Power Commission, (10th Cir. Dec. 9, 1966), 370 F.2d 181, 186–187; Amerada Petroleum Corp., *supra* note 55.

58. In Texaco Seaboard, 29 FPC 593 (1963), the Commission found the Texas Railroad District No. 3 in-line price to be 16¢ for the period preceding September 28, 1960. At the same time, the Commission set its guideline price at 17¢. 29 FPC 590 (1963). Now the Commission finds that the in-line price for District No. 3 has jumped to 17¢.

In Hassie Hunt Trust, 30 FPC 1438 (1963), the Commission found the District No. 2 in-line price to be 15¢ for the period preceding September 28, 1960. At the same time, the Commission set its guideline price at 16¢. 30 FPC 1435 (1963). Now the Commission finds that the in-line price for District No. 2 has jumped to 16¢.

In Skelly Oil Co., 28 FPC 401 (1962), the Commission found the District No. 4 in-line price to be 15¢ for the period preceding September 28, 1960. At the same time, the Commission set its guideline price at 16¢. 28 FPC 441 (1962). Recently the Commission found that the in-line price for District No. 4 has jumped to 16¢. See Sunray DX Oil Co. v. Federal Power Commission, *supra* note 57.

tradicts *CATCO's* admonition to hold the line in the interim period between the sale of gas and the determination of just and reasonable rates. According to *CATCO*, one reason why the consumer needs protection during the interim period is that the period is often long.[59] Under the present administration of the in-line price doctrine the amount of protection for the consumer decreases as the length of the interim period increases. The longer it takes to determine a just and reasonable price, the higher the in-line price becomes, and the consumers' potential refund drops accordingly. __

There is a final, and completely separate, reason why temporary prices should not affect the in-line price. The first court to discuss in-line prices held that prices which were suspect because they were under a cloud of court or Commission review could not be used in the permanent price array.[60] Since then almost every court,[61] including the Supreme Court,[62] has accepted the suspect price doctrine. The suspect price doctrine clearly includes temporarily certificated prices. Temporarily certificated prices may be, and often are, changed by the Commission. They are "subject to judicial review."[63] Prices that are so particularly subject to the hazard of change do "not provide a reasonably reliable basis upon which to predicate a price line."[64] And, acceptance of temporarily certificated prices has, in fact, had the effect of "creating a standard by which the questioned rates [are] judged."[65]

The producers argue, contrary to our holding, that temporarily certificated prices and contract prices must influence the in-line price. They rely on suggestions in some opinions that the line should "reflect current conditions in the industry."[66] This argument was adopted recently by the Tenth Circuit in Sunray DX Oil Co. v. Federal Power Commission[67] which held that it is permissible for the FPC to consider temporaries and contract prices.

However, the Tenth Circuit was faced with a problem very different from ours. There, only 1.39% of the gas sold in the area was permanently certificated.[68] On this basis the court refused to apply the suspect price doctrine and approved the FPC's method of determining the in-line price. "[W]hen no appreciable volume of gas is moving under permanent certificates, the Commission has nothing upon which to base a decision as to inlineness unless it turns to the temporaries."[69] In our case there is a substantial volume moving under permanent certificates.[70] We are not reviewing the FPC's method of determining an in-line price when there are no permanently certificated prices available for comparison.

Moreover, we cannot accept the reasoning of the Tenth Circuit's opinion as it applies to this case. Temporaries and contract prices do reflect current conditions in the industry because they reflect real dealings in the market place. This recognition, far from justifying reliance upon these prices, provides a reason for disregarding them. As we have noted,

59. *Supra* note 6, 360 U.S. at 389, 79 S.Ct. 1246.

60. United Gas Improvement Co. v. Federal Power Commission, *supra* note 36.

61. See, *e. g.*, Public Service Commission of State of New York v. Federal Power Commission, 109 U.S.App.D.C. 292, 287 F.2d 146, *supra* note 49 and Public Service Commission of State of New York v. Federal Power Commission, *supra* note 28.

62. United Gas Improvement Co. v. Callery Properties, *supra* note 31, 382 U.S. at 227, 86 S.Ct. 360.

63. *Ibid.*

64. United Gas Improvement Co. v. Federal Power Commission, *supra* note 36, 283 F.2d at 824.

65. *Ibid.*

66. See, *e. g., ibid.*

67. *Supra* note 57.

68. *Supra* note 57, 370 F.2d at p. 188.

69. *Supra* note 57, 370 F.2d at p. 189.

70. See, *e. g.*, H.A. 282, 284–86, 299–300; S.A. 220, 223, 226–27.

the need for in-line pricing arises because the unregulated market place cannot protect the consumer adequately. Reliance on prices over which there has been no careful regulatory control contradicts this need.

We are not suggesting, of course, that current conditions are never relevant to the FPC. In a § 4 or § 5 hearing the FPC considers current conditions in order to set a just and reasonable price. However, the courts have already rejected attempts to import standards relevant to § 4 and § 5 hearings into § 7 hearings. For example, in *Callery* the producers tried to introduce economic and financial evidence, but the FPC disregarded it.[71] The Fifth Circuit reversed the Commission. In essence the court said that this evidence was relevant to current conditions in the industry, and that these conditions were relevant to the determination of the in-line price.[72] The Supreme Court rejected this argument summarily. "To consider in this § 7 proceeding the mass of evidence relevant to the fixing of just and reasonable rates under § 5 might in practical effect render nugatory any effort to fix initial prices."[73] In the recent Tenth Circuit case the producers tried to introduce the same kind of evidence. The court responded:

> The producers seek to avoid the impact of *Callery* by the assertion that the proffered evidence was a streamlined presentation which could not cause any crippling delay. In our opinion, the admissibility of such evidence does not depend on any quantitative test. Relevance is determined by the substance of the offer. Although we agree with the producers that neither *CATCO* nor *Callery* establishes any specific evidentiary standards, the point is that the just

and reasonable rate standards of §§ 4 and 5 do not apply to § 7 where the test is public convenience and necessity.[74]

We think this response, which is properly based on the logic of *Callery* and *CATCO*, is inconsistent with the same court's acceptance of temporaries and contract prices. If the courts and the FPC will not allow consideration of evidence which shows what the current conditions are, then temporaries and contract prices should not be accepted on the basis that they reflect current conditions.

The purpose, quite simply, of a § 7 proceeding is to protect the consumer until the FPC can determine the just and reasonable rate. This latter determination depends, in part, on current conditions in the industry. The determination of an in-line price should not depend on current conditions, unless, in a particular case, there is something special about these conditions which requires the FPC to sacrifice some of the consumer's protection. For example, in a particular case, the FPC may feel that an in-line price which is too low subjects the producers to too much risk. And this risk may endanger investment in the industry. In that event the FPC would have to weigh this danger against the diminution of consumer protection. But the FPC has advanced no such reasons in this case. Here the FPC used temporarily certificated and contract prices in an automatic, arithmetical way to raise the in-line price, without attempting to justify the decrease in consumer protection.

Finally, it is argued that elimination of temporarily certificated and contract prices from the price array will cause a "price-freeze." But our proposed deci-

---

71. See Callery Properties v. Federal Power Commission, 335 F.2d 1004, 1009 (5th Cir. 1964), for a description of the evidence.

72. *Id.* at 1013.

73. *Supra* note 31, 382 U.S. at 227–228, 86 S.Ct. at 363. In *CATCO* the Supreme Court had already recognized the differ-

ence between the standards of a § 7 and a § 4 or § 5 proceeding. "[T]he Act does not require a determination of just and reasonable rates in a § 7 proceeding as it does in one under either § 4 or § 5." *Supra* note 6, 360 U.S. at 390, 79 S.Ct. at 1254.

74. *Supra* note 57, 370 F.2d at p. 186.

sion will not freeze the price of gas. If the producer is dissatisfied with the in-line price he can file a new, and higher, rate schedule under § 4 of the Act.[75] Neither will our decision permanently freeze the in-line price for an area. We presume that the in-line price will be adjusted after the Commission determines the just and reasonable price. It is true that our decision may cause the in-line price to be frozen temporarily during the interim period between sales of gas and the rate determination under § 4 or § 5 of the Act. This kind of freeze seems to be required by the logic of *CATCO* and in-line pricing. But we do not hold that the FPC can never raise the price line in the interim period. We hold only that the Commission has advanced no reason why an escalation is justified in this case.

*Other Claims Regarding the In-Line Price*

■ New York argues that the FPC erroneously determined the pre-Policy Statement in-line price for District No. 3, because it gave weight to prices "tainted" by other prices which were permanently certificated in 1956–57. New York thinks these 1956–57 prices were incorrectly certificated "in light of *CATCO* and the subsequent court cases." [76] Although sometimes it may be wise to re-examine certificated prices, we think that the FPC may give weight to permanently certificated prices even if they were certificated under standards later changed by the courts. This area of the law is constantly changing, and if we require the Commission to re-examine certifications whenever there is a new decision, hearings under § 7 will never end. The proper rule was stated by the Ninth Circuit.

No doubt there are many certificated prices—some under unconditional certificates and others * * * conditioned, some established in contested proceedings and others not contested—which might be different, and lower, if the Commission were passing on them under section 7 today. But this, we think, does not *require*, although it may *permit*, the Commission to disregard them or to give little weight to them in deciding what is an appropriate price line to which to refer.[77]

■ Though the FPC is not required to re-examine permanently certificated prices, neither is it required to include a price in the price array simply because the price was sanctioned in a permanent certificate. The Commission may ignore a price if it has a good reason to do so.[78] In this case, over Superior's objection, the Commission refused to give full weight to certain 20¢ sales. According to the FPC these and similar sales should be discounted because "they either have subsequently been set aside * * * or would have been set aside * * * save for the procedural defect in the PSC review action." [79] This reason is adequate, and we do not think the Commission abused its discretion by not giving full weight to the 20¢ sales.

*Lone Star Gathering Company*

New York claims that Lone Star is a gathering company rather than a pipeline, and therefore sales to Lone Star should be certificated at the in-line price less the cost of gathering. Since oral argument we have been informed that in Opinion No. 505 the FPC granted Lone Star and United Gas Pipe Line Company permission to consolidate some of their facilities.[80] The FPC was to rehear that

75. See note 45, *supra.*

76. Brief for Petitioner, p. 27.

77. People of State of California v. Federal Power Commission, 353 F.2d 16, 23 (9 Cir., 1965). [Emphasis in the original.]

78. A price which is not "comparable" is not considered even if it is permanently

certificated. See United Gas Improvement Co. v. Federal Power Commission, *supra* note 36, 283 F.2d at 823.

79. H.A. 284.

80. Lone Star Gas Company, *et al.*, Docket Nos. CP65–118, *et al.*, issued August 22, 1966.

case beginning December 6, 1966.[81] Since we do not know what effect the Commission's final decision will have on the issue before us, we reserve decision on New York's claim.

We need not deal with any of the other contentions regarding the in-line price. Some of the parties may now wish to abandon some of their claims. On remand the FPC can deal with the remaining claims according to the principles announced in this opinion.

## III

*Refunds*

New York argues that the FPC erroneously postponed a decision about whether the producers must refund amounts which were collected, pursuant to temporary certificates, in excess of the in-line level set in the permanent certificate. The FPC answered that it had been awaiting the Supreme Court's action in the *Callery* case which was not decided until December of 1965.[82] According to the FPC's brief, its decision in this case "should be forthcoming in the near future" now that the Supreme Court has decided *Callery*.[83] The Commission took its promise seriously, and on July 22, 1966, it issued Opinion No. 498 which required refunds from some of the producer-applicants involved in the *Hawkins* proceeding.[84] We may assume that a decision in *Sinclair* will follow.

## IV

*Interest Rates*

■■■ Superior attacks the FPC's order which set interest rates for some refunds at 7% and for others at 4½%. Since Superior did not make this objection in an application for rehearing before the Commission, we cannot deal with the claim.[85] In any event, at least

on the record and briefs now before us, the Commission's justification for the 7% interest rate seems reasonable.

The Commission's order will be set aside and the case remanded to the Commission for further proceedings consistent with this opinion. So ordered.

WILBUR K. MILLER, Senior Circuit Judge, dissents.

## APPENDIX

(See text at notes 35–39, *supra.*)

Statements Explaining the Method Used to Determine the in-Line Price

In *Hawkins* the hearing examiner explained his decision in the following terms:

It will be observed from the foregoing distribution of prices for the period September 28, 1960 through December 31, 1963 [the price array], that the largest concentration of sales occurred at 14 cents and 15 cents per Mcf, and that the largest volumes of gas were sold at or below 15 cents per Mcf—more than 80 percent. The average sales price for the period was approximately 14.67 cents and the average sales price by volume was approximately 15.51 cents per Mcf. In respect to the period January 1, 1958 through September 27, 1960 more than 73 per cent of the sales occurred at 16 cents or below and these sales account for more than half the volume.

The average sales price for this period is 15.41 cents per Mcf and the average sale price by volume is approximately 16.76 cents per Mcf. When the two periods are combined (January 1, 1958 through December 31, 1963) it is apparent that there are two major concentrations of sales namely at 14 cents

81. Order issued October 14, 1966.

82. *Supra* note 31.

83. Brief for Respondent, p. 37.

84. H. L. Hawkins & H. L. Hawkins, Jr. (Operator), *et al.* Docket Nos. G–18077,

*et al.* The order was amended in Opinion No. 498–A (December 6, 1966).

85. 15 U.S.C. § 717r(b) (1964). *Cf.* Utah Power & Light Co. v. Federal Power Commission, 339 F.2d 436 (10th Cir. 1964).

and 15 cents and minor concentrations at 13.5, 14.5, 16.2 and 20 cents. The average price of the 94 sales is 15.11 cents per Mcf and the average by volume is 16.43 cents per Mcf.

In view of the foregoing and the evidence adduced there is ample support for finding that 16 cents per Mcf at 14.65 psia is an appropriate "in line" price applicable to producer contracts in this proceeding for the period prior to September 28, 1960. The Staff witness found, however, that 16.2 cents was the appropriate "in line" price applicable to the period following September 28, 1960 and in doing so stressed the significance of the sales which were made at 16.2 cents per Mcf. (Four sales before September 28, 1960 and three afterwards.) We do not think that this is decisive. Indeed there is evidence which tends to show that a higher price may be justified for the pre-Policy Statement period than for the post-Policy Statement period.

It is manifest that the "in line" price is neither the highest price nor the lowest price at which gas is sold from a particular area in interstate commerce. It is also clear that it is not the general average of prices at which gas is sold in a particular period or indeed the mathematical weighted average. Consideration necessarily must be given, however, to the number of sales as well as to the volume—large volumes frequently selling at higher prices than low volumes. Consideration should be given to numerous factors depending upon individual circumstances from one case to another. Consideration must also be given to the Commission's Statement of General Policy No. 61–1, and to policy of the Natural Gas Act as heretofore construed by the Commission and by the courts particularly by the United States Supreme Court in the CATCO case. Atlantic Refining Co. v. P. S. C., 360 U.S. 378 [79 S.Ct. 1246]. In view of these factors and all the facts of

record we conclude that the subject sales in this proceeding from the Texas Railroad District No. 3 made under contracts executed both before and after the Policy Statement dated September 28, 1960 should be conditioned at a price no greater than 16 cents per Mcf at 14.65 psia. H.A. 248–50.

When the Commission reviewed the examiner's initial decision, it explained the method as follows:

For the pre-Policy Statement period we agree with the examiner that 16 cents per Mcf * * * is the appropriate in-line price. * * * As can be seen from the table above [the price array], there are comparatively large volumes of gas sold at the 16.0 and 16.2-cent levels, small volumes at 17.5 and 18.0, and very large volumes at 20 cents. 38 sales (72 percent) are at 16 cents or below, while a little more than half the volume is sold at 16 cents or below. * * * Arithmetically the large volumes at 20 cents would have a strong effect on the weighted average of 15.16 cents per Mcf, but these should be discounted. * * *

The producers, on the other hand, argue that the 20 cent sales, if not given full weight, should be given some weight. The Commission adopted this consideration in Sun Oil Co. * * * A ceiling at 16 cents for the pre-Policy Statement period, in effect, gives some weight to the prices above 16 cents as well as the contract prices and the prices under temporary certificate, for if we gave no consideration to the prices above 16 cents, the ceiling would be set at a lower level, since ordinarily we do not set the ceiling price at the highest level.

As for the post-Policy Statement period, it may be observed that there are nine sales and moderate volumes at 15 cents, three sales and moderate volumes at 16.2 cents, one sale and a small volume at 16.5 cents, and three large sales at 18.0 cents. As the producers

argue, the fact that the 18-cent prices were established in abridged hearings should not detract from their weight in setting the line. * * *

We are of the opinion that 17.0 cents per Mcf * * * is the in-line price for the period following September 28, 1960. It is our judgment that this conclusion gives appropriate weight to the comparatively large volumes sold under permanent certificates at 18.0 cents per Mcf while reflecting the weighted average price of 16.17 cents per Mcf. In addition, a 17.0 cent price clearly gives some weight to the unconditioned contract prices and to the prices under temporary certificates. Finally, some 43 percent of the gas has been permanently certificated at a price higher than 17.0 cents. One proposed sale * * is at 17.0 cents, under a contract dated October 1, 1963. Giving due consideration to all sales in the area during the period in question, an in-line price of 17.0 cents is fully justified. H.A. 284–286.

In *Sinclair* the trial examiner determined the pre-Policy Statement in-line price as follows:

Applying the criteria for the determination of an in-line price, as developed by the numerous Commission and Court decisions following *Catco*, to the data in the foregoing tabulation, resulted in a numerically weighted average price of 16.68 cents per Mcf and a volumetrically weighted average price of 17.18 cents per Mcf. In according the proper evidentiary weight to the evidence of record, most reliance or the greatest weight has been accorded the 14 permanently certificated sales with an estimated first month's delivery volume of 460,575 Mcf. These sales and volumes do not "reflect current conditions in the industry" because of their limited nature. Having accorded the greatest weight to the permanently certificated sales and in giving appropriate consideration to

temporary certificated sales at substantial volumes presently moving in interstate commerce, it is concluded the public convenience and necessity requires the natural gas here under consideration at an in-line price of 16.0 cents per Mcf at 14.65 psia.

The in-lineness of the 16.0 cents per Mcf here determined may be further demonstrated. The Commission said in Texaco-Seaboard Inc., *et al.*, 27 FPC 482, 485, and Hassie Hunt Trust (Operator) *et al.*, 30 FPC 1438, 1445, " * * * as brought out in *Catco* and * * * in Texaco-Seaboard, the price line does not accord with the highest price or prices permanently authorized but falls between the highest group of prices and the median price." Applying this test to Staff Chart 3, Exhibit 4, [the price array] * * *, reveals a median price of 14.57 cents (volumetric weighted average) which, when averaged with the highest price of 17.-59 cents, produces an in-line price of 16.08 cents per Mcf.

A similar test further illustrates the in-lineness of the 16.0 price per Mcf.

Using *all* permanently (77) and *all* temporarily (35) certificated sales related to *all* volumes of natural gas (4,-390,500 Mfc) moving in interstate commerce during the period after September 28, 1960, and through March 10, 1964, from District No. 2, a volumetrically weighted average price of 15.15 cents per Mcf is indicated. This median price when averaged with the highest temporarily certificated price of 18.00 cents per Mcf produces an in-line price of 16.57 cents per Mcf. S.A. 181–82.

Of the post-Policy Statement in-line price, the examiner said:

For the 22 sales being made in the 14.0 to 14.75 cent price level in the above tabulation [the price array] the numerically weighted average price is 14.24 cents and the volumetrically weighted average price is 14.35 cents

per Mcf at 14.65 psia. However, the numerically weighted average price for the 29 sales is 14.58 cents per Mcf and the volumetrically weighted average price is 14.84 cents per Mcf at 14.65 psia. Considering the foregoing data and the evidence of record showing the history of prices and the price patterns in District No. 2, the Examiner is of the opinion that the present or future public convenience and necessity requires the natural gas here under consideration at an in-line price of 15.0 cents per Mcf at 14.65 psia. S.A. 185–86.

The Commission further explained the method of selecting the post-Policy Statement in-line price as follows:

A totaling of all permanently and temporarily certificated sales in District No. 2 under contracts dated after September 28, 1960 and through March 10, 1964, exclusive of the sales to Valley at 14 cents, shows a listing of 101 sales involving a combined estimated first month volume of 4,060-388 Mcf. The median price on a volumetric basis is 16.00 cents and the volumetric weighted average price is 15.29 cents. Approximately 53 percent of the estimated first month volume covered by these sales moved in the price range of from 16 cents to 18 cents. On the basis of these calculations, and with recognition of the fact that the temporarily certificated sales represented most of the sales above the 16 cents price level, and should not be accorded undue weight, and giving some weight to the unconditioned contracts we conclude that the price of 16 cents per Mcf represents the correct post-policy in-line price of jurisdictional sales of natural gas in District No. 2. In reaching this result we may observe that if we confined ourselves to permanently certificated sales we would not find a line as high as 16 cents, for the next highest sales are at the 15.25 cents level. S.A. 225–26.