The ATLANTIC REFINING COMPANY,
Petitioner,

v.

FEDERAL POWER COMMISSION,
Respondent,

Philadelphia Electric Company,
Intervenor.

No. 17166.

United States Court of Appeals
District of Columbia Circuit.

Argued Feb. 6, 1963.

Decided March 21, 1963.

Mr. Sherman S. Poland, Washington, D. C., with whom Mr. Bernard A. Foster, Jr., Washington, D. C., was on the brief, for petitioner.

Mr. Howard E. Wahrenbrock, Sol., F. P. C., with whom Messrs. Richard A. Solomon, Gen. Counsel, Robert L. Russell, Asst. Gen. Counsel, and Arthur H. Fribourg, Atty., F. P. C., were on the brief, for respondent.

Mr. Donald Blanken, of the bar of the Supreme Court of Pennsylvania, pro hac vice, by special leave of court, with whom Mr. Eugene J. Bradley, Washington, D. C., was on the brief, for intervenor.

Before FAHY, BASTIAN and WRIGHT, Circuit Judges.

J. SKELLY WRIGHT, Circuit Judge.

The Federal Power Commission issued petitioner a certificate of public convenience and necessity authorizing a sale of natural gas conditioned on the reduction of the initial base price under its contract with United Gas Company from 18.5 cents per Mcf[1] to 16.5 cents. Petitioner challenges this price condition, alleging it is "out of line" within the meaning of CATCO.[2]

In Phillips Petroleum Co. v. Wisconsin, 347 U.S. 672, 74 S.Ct. 794, 98 L.Ed.

1. Thousand cubic feet.

2. Atlantic Refining Co. v. Public Service Comm., 360 U.S. 378, 78 S.Ct. 1246, 3 L.Ed.2d 1312 (1959).

1035 (1954), the Supreme Court required a reluctant Commission to undertake its responsibility under the Natural Gas Act[3] of regulating the interstate sale of natural gas. In CATCO the Supreme Court told the Commission that the prime consideration in issuing a certificate of public convenience and necessity under Section 7 of the Act is the price at which the gas is to enter the interstate market. Several Courts of Appeals[4] have repeated the admonition. The record in this case indicates that the Commission has now begun to comply with these instructions.

■ In passing the Natural Gas Act, Congress intended "that natural gas shall be sold in interstate commerce for resale for ultimate public consumption for domestic, commercial, industrial, or any other use at the lowest possible reasonable rate consistent with the maintenance of adequate service in the public interest." 52 Stat. 825. Pursuant to this purpose, the Act outlines a scheme for the control of natural gas rates. Section 7[5] provides that "[n]o natural-gas company * * * shall engage in the transportation or sale of natural gas * * * unless there is in force with respect to such natural-gas company a certificate of public convenience and necessity issued by the Commission authorizing such acts or operations." The burden of proving the public convenience and necessity is, of course, on the natural gas company and, as indicated, the price of the gas is one of the prime considerations.

Section 4[6] of the Act authorizes a natural gas company to increase the price of its gas, provided, of course, there is no limiting contract with the purchaser, but incorporates a mechanism for the recovery of the increase by the purchaser if the Commission, after hearing, disallows it. Unlike Section 7, Section 4 contemplates a full rate proceeding with the burden on the company to prove that the rate as increased is "just and reasonable." Section 5[7] also provides for a rate proceeding limited to testing the validity of an existing rate. A Section 5 proceeding is initiated by the Commission upon its own motion or upon complaint of parties interested in reducing the rate. As under Section 4, the "just and reasonable" test is applied, but there is no mechanism for the refund of overcharges pending the proceeding and the burden of proof is on the Commission. In practice Section 5 has proved relatively ineffective because of the difficulty the Commission has experienced in controlling the length of the rate proceedings[8] and there is no consumer protection during their pendency. Consequently, the burden of protecting the public interest has fallen on Sections 7 and 4 where the burden of proof is on the independent producer.

This burden of proof is most important in arriving at a proper rate for natural gas. Producers charge off as expense unsuccessful exploration costs and capitalize only those expenses involved in producing wells.[9] Thus the cost of service or rate base approach hardly reflects the real investment of the company.

3. 52 Stat. 821, 56 Stat. 84, as amended, 15 U.S.C. § 717 et seq.

4. United Gas Improvement Co. v. Federal Power Comm., 5 Cir., 290 F.2d 133 (1961); United Gas Improvement Co. v. Federal Power Comm., 10 Cir., 287 F. 2d 159 (1961); Public Service Comm. of New York v. Federal Power Comm., 109 U.S.App.D.C. 292, 287 F.2d 146 (1960); United Gas Improvement Co. v. Federal Power Comm., 9 Cir., 283 F.2d 817 (1960).

5. 52 Stat. 824, 15 U.S.C. § 717f.

6. 52 Stat. 822, 15 U.S.C. § 717c.

7. 52 Stat. 823, 15 U.S.C. § 717d.

8. As of January 1, 1961, a total of only four Section 5 proceedings involving producers had been concluded since the Act was passed. Re Phillips Petroleum Co., 35 P.U.R.3d 199 (1960); C. V. Lyman, 22 F.P.C. 557 (1959).; Ralph E. Fair, 20 F.P.C. 810 (1958); Gillring Oil Co., 20 F.P.C. 770 (1958). Literally they go on for years.

9. Hearings on Amendments to the Natural Gas Act Before the Senate Committee on Interstate and Foreign Commerce, 84th Cong., 1st Sess., p. 1074 (1955).

Consequently, to limit producers to the traditional six per cent of their investment in successful wells would not be a "just and reasonable" return on their total investment in the exploration for natural gas. In addition, the determination of a fair return is complicated by the fact that oil and gas at different times are produced from the same wells, thus making the proper allocation of costs for each product difficult indeed. Also, unlike a traditional utility, many independent producers of natural gas are engaged in a variety of business activities. Filtering out and allocating costs to the production of natural gas in such enterprises presents a substantial challenge to the rate maker. See State of Wisconsin v. Federal Power Commission, 112 U.S.App.D.C. 369, 374, 303 F.2d 380, 385 (1962), cert. granted, 369 U.S. 870, 82 S.Ct. 1139, 8 L.Ed.2d 275 (1962).

The Commission has therefore experimented with other guides to the determination of a "just and reasonable" return for the producer of natural gas. Currently it is using so-called area pricing, under which an initial rate base for a producing area is indicated by regulation, together with provision for increased rates. While the order in suit relates to a period prior to the promulgation [10] of the area pricing policy by the Commission, in effect this approach [11] appears to have been used here in determining the proper initial rate under Section 7.

In arriving at initial rates under Section 7, the Commission, of course, does not foreclose a company from obtaining an increase under Section 4. As indicated, Section 4 is a rate proceeding and Section 7 is not. But the public must be protected from the time the gas first enters interstate commerce. Since there is no mechanism for refund of overcharges under Section 7, if the Commission is to err in setting an initial rate, it should err on the low side because the company, under Section 4, can immediately increase the rate, subject to disallowance by the Commission after a full rate proceeding, the public being protected with reference to refunds in the interim.

In CATCO the Supreme Court outlined the importance of Section 7 in the Congressional scheme "to afford consumers a complete, permanent and effective bond of protection from excessive rates and charges." 360 U.S. at 388, 79 S.Ct. at 1253. It advised the Commission how to use Section 7 in protecting the public interest. It suggested that, without trenching on the initial rate-making privileges allowed natural gas companies under the Act, the Commission should condition the certificate of public convenience and necessity as to price so that "the consuming public may be protected while the justness and reasonableness of the price fixed by the parties is being determined under other sections of the Act." 360 U.S. at 392, 79 S.Ct. at 1255. To this end it suggested that the Commission use Section 7 to "hold the line awaiting adjudication of a just and reasonable rate." 360 U.S. at 392, 79 S.Ct. at 1255. Natural gas rates in the last decade in many areas have more than doubled. The Supreme Court was naturally concerned that the Commission was not sufficiently protecting the public interest and, consequently, ordered the Commission to "hold the line."

In fixing the rate here, the Commission apparently has tried to "hold the line." The record shows that the Commission considered all north Louisiana sales of natural gas during the period

---

10. See 25 Fed.Reg. 13969 (1960).

11. In using the area pricing approach, it must be remembered that the purchaser of natural gas, usually the pipe line company, is a regulated utility. To it, the price of gas is of no great concern, because whatever price it pays can be recovered from the consumer through an increase in rates. Thus a contract between a producer and a pipe line company is not necessarily an arms length transaction. Under the circumstances, if the consumer is to be protected at all, the Commission must do it. And the escalations in the price of gas since Phillips have not been a source of satisfaction to the state agencies charged with consumer protection.

from June, 1958, to October, 1959. Of the 44 sales made during this period, 25 were priced at 16.5 cents, 8 at 17 cents, 1 at 16 cents, 1 at 14.25 cents, 3 at 14 cents, 1 at 13.25 cents, 2 at 13 cents, 1 at 12.75 cents and 2 at 12.25 cents. In 1958 there were three non-jurisdictional sales from the area at prices from 18 to 19.5 cents. From 1957 through 1960 only one jurisdictional sale had been permanently certificated above 17 cents and that at 18.5 cents.

Petitioner's sale was dated February 20, 1959, at which time none of the sales at 17 cents had yet been made. As to the one suspect [12] 18.5-cent sale, this, as the Commission suggests, was a mistake. It of all sales in the area at the time was out of line. Yet petitioner's primary complaint [13] is that the Commission did not use this one sale alone in determining what the line was. As used in CATCO, the line means the price at which similar sales, not suspect, were made under similar circumstances from the same area about the same time. Applying that definition, the conditioned price of 16.5 cents fixed by the Commission was clearly in line.

Petitioner argues that even under CATCO there are considerations other than price in determining whether a certificate of convenience and necessity should be issued under Section 7. That, of course, is true. But here the petitioner, along with all the other applicants in the consolidated proceedings [14] before the Commission, agreed that price was the only issue to be considered, it being conceded that the other requirements of public convenience and necessity had been fully met by the proposed sale. Petitioner also asserts that its sale should have been considered on an individual basis, that its financial position, its costs of production, were different from those of producers who were able to sell gas at 16.5 cents from the same area at the same time. Petitioner offered no proof before the Commission to show any such difference. What evidence there is in the record indicates that drilling costs in the area would be generally the same for all producers. In any event, the Commission is not required to subsidize high cost producers with consumers' money. Moreover, because of the difficulties inherent in determining what costs of production of natural gas actually are, the Commission should be allowed some latitude in fixing initial prices on an area basis [15] in order that hearings under Section 7 will not become as interminable as Section 5 hearings have been. Of course, if area pricing degenerates into mere acceptance of the contract price in the producing area, then will be time enough to stay the Commission's hand.

Considering the record as a whole, we are not able to say that the Commission abused its discretion in conditioning the certificate of convenience and necessity in this case. It facilitated petitioner by giving it a temporary certificate [16] at the price agreed on by the parties so that its deliveries could begin without delay, but it protected the con-

12. As indicated supra, Note 11, all gas sales are not necessarily arms length transactions. Moreover, sales subject to litigation before the Commission or in court, and all sales similar to such sales, are suspect. See United Gas Improvement Co. v. Federal Power Comm., supra, Note 4, 287 F.2d 159, 162; Public Service Comm. of New York v. Federal Power Comm., supra, Note 4. The one 18.5-cent sale was the subject of a Section 5 proceeding and therefore suspect.

13. Petitioner also cites a certificated 21.5-cent sale with delivery to commence in six years. The Commission properly disregarded this sale as dissimilar.

14. The Commission consolidated petitioner's application with twelve others likewise applying for certificates covering sales of gas to United Gas Company from north Louisiana fields at 18.5 cents.

15. Compare State of Wisconsin v. Federal Power Commission, supra, 112 U.S.App. D.C. at 378, 303 F.2d at 389.

16. Pursuant to F.P.C. Regulation 157.28, 18 C.F.R. § 157.28.

sumer by requiring a refund [17] in the event the certificate, when permanently issued, would be conditioned at a lesser price. Thus the Commission here acted wisely in expediting the authority to sell the gas without jeopardizing the public interest.

Affirmed.

17. The legality of the refund condition is not in issue here. But see Sunray Mid-Continent Oil Co. v. Federal Power Comm., 10 Cir., 270 F.2d 404 (1959). Compare Texaco, Inc. v. Federal Power Commission, 5 Cir., 290 F.2d 149, 156–157 (1961).