PUBLIC SERVICE COMMISSION FOR
the STATE OF NEW YORK,
Petitioner,

v.

FEDERAL POWER COMMISSION,
Respondent,

Natural Gas Pipeline Company of
America, Intervenor.

No. 71–1161.

United States Court of Appeals,
District of Columbia Circuit.

Argued Jan. 28, 1972.

Decided March 29, 1972.

Rehearing Denied May 19, 1972.

Mr. Richard A. Solomon, Washington, D. C., for petitioner.

Mr. Francis C. Allen, Atty. F.P.C., for respondent. Messrs. Gordon Gooch, Gen. Counsel, F.P.C., Leo E. Forquer, Sol., and J. Richard Tiano, Asst. Sol., F.P.C., were on the brief for respondent.

Mr. Paul E. Goldstein, Chicago, Ill., with whom Mr. William W. Brackett, Chicago, Ill., was on the brief, for intervenor.

Before ROBINSON, MacKINNON and WILKEY, Circuit Judges.

WILKEY, Circuit Judge:

The Federal Power Commission (FPC) in the *Southern Louisiana Area Rate Proceeding* recognized that this country is now facing a critical shortage of natural gas,[1] attributable to an un-

---

1. FPC Docket Nos. AR 61-2, *et al.* and AR 69-1. Opinion No. 598, issued 16 June 1971, at 23. *See also* Southern Louisiana Area Rate Cases v. FPC, 428 F.2d 407, 437 (5th Cir. 1970), *cert. denied*, Municipal Distributor Group v.

precedented demand for "clean" gas energy which has not met with commensurate exploration and development.[2] Interpreting its duty to be "to take all the action we believe necessary to reverse [the] downtrend of the exploration and development effort," [3] the FPC has taken several steps to alleviate the natural gas shortage. The case at bar is a result of one of these steps taken by the FPC to meet this established need, its decision that under certain conditions advance payments, made by natural gas pipelines to natural gas producers for gas to be delivered at a future date, may be included in the rate base which the pipeline uses to calculate the price that consumers will be charged for the gas.[4]

The rationale behind this decision is that the advance payments will help to give the gas producers the necessary investment capital to finance the development and production needed to alleviate the gas shortage, and the pipelines will be encouraged to make such advance payments if they are allowed to include the payments in their rate base, thus virtually simultaneously shifting the cost of the advance payments to the pipelines' customers, the natural gas consumers. This treatment of advance payments to producers was proposed to the FPC by the pipelines, on the theory that "the costs so incurred [by making advance payments] should be recoverable from cus- tomers in rates because such costs are directly associated with the acquisition of gas supply for [the pipelines'] customers and, . . . absent such advances, such gas supply would be unavailable." [5]

In a Notice of Proposed Rulemaking, issued 23 January 1970 in response to the proposal of the pipelines,[6] the FPC noted that "The Commission has never specifically ruled on whether pipelines should be permitted to reflect in their rates costs associated with advance payments," and that since "this matter is an important policy question," the FPC invited "comments by interested persons expressing their views of the appropriate treatment." [7] The FPC received comments from thirty-four respondents, including gas companies, electric companies, oil companies, public service commissions, and others.[8] A glance at the list of respondents and the FPC's allowance of extra time for the filing of some of these comments (until 1 June 1970 in some cases) suggests that the views of those affected were amply ventilated.

On 2 October 1970 the FPC issued Order 410, which indicated that the FPC approved of a method of accounting treatment of advance payments, apparently in line with the thinking of the pipelines, whereby "advance payments for gas would be recorded as prepayments and unrecovered advance pay-

FPC, 400 U.S. 950, 91 S.Ct. 241, 27 L.Ed. 2d 257; Initial Rates for Future Sales of Natural Gas for All Areas: Opinion and Order Establishing Initial Rates in the Rocky Mountain Area, FPC Docket Nos. R–389 and R–389A, Order No. 435, issued 15 July 1971, at 6–7.

2. See *Southern Louisiana Area Rate Proceeding, supra* note 1, at 19ff. and 32ff.

3. *Id.*, at 6.

4. See FPC Order No. 410, Order Amending Regulations Under the Natural Gas Act, Uniform System of Accounts for Class A and Class B Natural Gas Companies and Annual Report Form No. 2, issued 2 October 1970; Order No. 410–A, Order Amending Regulations Under the Natural Gas Act, Uniform System of Accounts for Class A and Class B Natural Gas Companies, issued 8 January 1971; and Order No. 441, Order Amending Regulations Under the Natural Gas Act, Uniform System of Accounts for Class A and Class B Natural Gas Companies and Annual Report Form No. 2, issued 10 November 1971 (Docket No. R–411, Accounting and Rate Treatment of Advance Payments to Suppliers for Exploration and Lease Acquisition of Gas Producing Properties). The three above orders will be referred to hereafter simply as Order 410, Order 410–A, and Order 441.

5. Notice of Proposed Rulemaking, Docket No. R–380, issued 28 January 1970, Appendix, p. 1.

6. *Id.*, at 1.

7. *Id.*, at 2.

8. Order 410, Appendix, p. 31.

ments would be included in the rate base as part of working capital." [9] While it could have been made somewhat more explicit, it nonetheless appears clearly that the FPC had accepted the reasoning of the pipelines that such treatment of advance payments as rate-base items would help alleviate the shortage in the gas supply. Thus, in Order 410 the FPC concluded that "alternative method A should be adopted because of its accounting soundness and the encouraging effects it would have on gas supply." [10] And the FPC added that if it had approved Alternative C, excluding advance payments from the rate base (and thereby removing the immediate adverse cost effects to consumers), it would have been unsatisfactory:

> . . . several respondents opposed alternative method C because it was believed that if it were adopted, it would be a depressant to development of future sources of supply of natural gas, and therefore not in the public interest. The Commission agrees with the comments in opposition. [11]

Next, on 8 January 1971, in response to petitions for rehearing of Order 410, the FPC issued Order 410–A, which gave further amplification of the treatment to be accorded advance payments. On the same day the FPC issued a Notice of Proposed Rulemaking in Docket No. R–411, the object of which notice was "to afford all parties further opportunity to comment" on the treatment of advance

payments and particularly advances for exploration and lease acquisition costs. [12]

In addition to some minor changes in the pipelines' Balance Sheet Account for Advance Payments, Account 166, Order 410–A enlarged upon the scope of Order 410 insofar as the FPC indicated that "advances by pipelines to independent producers for *exploration and lease acquisition costs* will be assured of accounting and rate treatment pursuant to Order 410 as modified herein." [13] Finally, Order 410–A provided that "Advances to independent producers *and to affiliates* for development in this interim [before Order 441, in Docket R–411] will be assured of accounting and rate treatment pursuant to Order 410. . . ." [14] With regard to another area of contention here, advance payments by pipelines to *their own affiliates for exploration and lease acquisition costs*, the FPC reserved for determination in Docket R–411 whether such advances would be assured rate treatment pursuant to Order 410. On 26 February 1971 the FPC denied the petitions for rehearing of Order 410–A. One of these petitioners was the Public Service Commission of the State of New York, which filed the present action for review on 5 March 1971.

On 10 November 1971 the FPC issued Order No. 441, in Docket No. R–411. Probably the most important feature of Order 441 was to add a new account, "167, Other Advance Payments for Gas," which is not to be a rate-base account,

---

9. *Ibid.* This was called by the FPC, "Alternative A," and was one of the three methods of treatment that it had been considering. See Appendix, pp. 31–32.

10. Appendix, p. 32.

11. *Id.*, at 33.

12. Order No. 441, at 1. The end result of this Notice of Proposed Rulemaking in Docket No. R–411 was Order 441, issued 10 November 1971. See *infra*, text accompanying notes 15–18. This order was issued after the briefs were filed in the case at bar, but we granted the FPC's motion to lodge Order 441, and an-

other order entitled "Order of Clarification and Denial of Rehearing or Modification," issued 7 January 1972, in the present proceeding. As there was ample oportunity to discuss these latest developments in oral argument, no party was prejudiced by their introduction into the record, and we agreed with the FPC that it "would allow this Court to be apprised of the most recent determinations by the Commission in the subject matter befor this Court on appeal." Motion to Lodge Commission Orders, filed 17 January 1972, at 2.

13. Appendix, p. 56 (emphasis supplied).

14. *Ibid.* (emphasis supplied).

but will include some advance payments, most notably those for exploration and lease acquisition. These types of advance payments are thus removed from the rate-base account created by Orders 410 and 410–A, which rate-base account is now to be called "166, Advance Payments for Gas Development and Production." [15] This was a change in the procedure for accounting for exploration and lease acquisition advance payments under Order 410–A, which had allowed them rate-base treatment.

In other provisions of Order 441 the FPC provided that "for rate purposes advanced payments to pipeline affiliated producers shall be treated the same as advances to independent producers," [16] but that "[w]here a working interest [17] is obtained by a pipeline or a pipeline affiliate as a result of a related advance payment, we have determined that such a payment should be included in the applicable production account and not be accorded rate base treatment." [18]

Thus the FPC resolved some of the questions that it had left open in Order 410–A, by deciding that, in general, payments to affiliated producers would be treated the same for rate base purposes as payments to unaffiliated producers, although this would not be so where the pipeline acquired a "working interest" in the producer, and in the case of *both*

independent and affiliated producers, advance payments for exploration and lease acquisition would not be afforded rate-base treatment. Order 441 also provided that "All advances made under contracts executed prior to the issuance of this order shall receive rate treatment in accordance with the provisions of Order Nos. 410 and 410–A." Order 441 is temporary in effect, and is to apply only to contracts executed before 1 January 1973.

In its brief, filed before Order 441, the Public Service Commission of the State of New York (New York) raised three issue: (1) whether the FPC could lawfully allow pipelines to include advance payments to producer suppliers in the rate base, when the FPC "either did not consider or gave inadequate consideration to the questions of whether the producers could receive such advance payments or, if so, their effect upon the lawful price they may charge for gas"; (2) whether there was any basis for the FPC's authorizing rate-base treatment for advance payments made to production affiliates of pipelines, or for exploratory or lease acquisition purposes; and (3) whether the procedures adopted to protect against unjust enrichment of the pipelines as a result of advance payments paid for by their customers or for undue delay in eliminating advance payment accounts are adequate. [19]

15. See Order 441, at 7.

16. *Id.*, at 4.

17. "Working interest" was defined as "embodying operating rights and/or the right to share in production or revenues from the producing venture, so that its receipt of production or revenues will increase as the production or revenues from the producing venture increase, without any termination of such right to receive production or revenues after the return of the amount of any related advance payment." Order 441, at 5.

18. Order 441, at 5.

19. Order 441, by removing from the rate-base advance payments for exploration and lease acquisition purposes, and by certain other measures, obviated some of the arguments of New York, and after

Order 441 was issued, New York filed a petition for rehearing of that order with the FPC in which the objections which it had to the legality of the advance payments scheme were somewhat differently stated. According to the FPC's "Order of Clarification and Denial of Rehearing or Modification," in Docket No. R–411, issued 7 January 1972, New York made four arguments against the treatment of advance payments authorized by Order No. 441: 1) New York opposes as "unlawful" the FPC's authorization of rate base treatment for advance payments made for development purposes through 31 December 1972, (This appears to be essentially the same as the first argument made by New York in its brief filed with us.), 2) New York opposes as "unlawful" that portion of Order No. 441 which provides that all advances made prior

We are not persuaded by the arguments made by New York, and we affirm the determinations of the FPC.

## I. The Authorization to Pipelines to Treat Advance Payments as Part of the Rate Base

New York's challenge to the FPC's decision to treat some advance payments made by the pipelines as rate-base items appears to rest on two grounds. The first is New York's accusation that "the basis for the Commission's action is obscured by the lack of an adequate statement of purpose in its Notice of Proposed Rulemaking, and almost complete absence of any discussion of the comments, or other statements of the reasons for its actions, in Orders 410 and 410–A. . . . " [20] The second is what New York has characterized as "[t]he anomaly of purporting to decide that pipeline customers could be obligated to reimburse the pipelines for advance payments when the Commission had not yet determined whether producers could receive such payments." [21]

### A. The Basis for the Action of the Commission

■ We think that the basis for the action of the Commission is quite clear. It had become well-known by the time of the orders in the case at bar that a dangerous shortage of gas was developing.[22] Although, as we mentioned earlier, it might have been made somewhat more explicit, we think it is quite plain from the words of the Commission in the Notice of Proposed Rulemaking in Docket No. R–380, and in Order 410, that it decided to accord advance payments rate-base treatment because it hoped thereby to encourage development by producers, and thus help alleviate the gas shortage.[23]

In any case, we agree with the FPC that since the proceeding in the case at bar was pursuant to the FPC's rulemaking authority under the Natural Gas Act,[24] it has satisfied the requirements placed upon it.[25] Such rulemaking is done pursuant to Section 4 of the Administrative Procedure Act,[26] which requires notice of the proposed rulemaking "including reference to the legal authority under which the rule is proposed and the substance of the proposed rule." The notice in this case, the Notice of Proposed Rulemaking of 23 January 1970, clearly meets this test.[27] The FPC also met the APA requirement that the agency provide interested persons the opportunity to submit written comments,[28] and, what is most crucial with regard to New York's argument, we find that the FPC met the requirement of Section 4(b) of the APA that there be a "concise general statement" of the basis and purpose of the rule(s) adopted.[29]

As Judge McGowan said in Automotive Parts & Accessories Association v. Boyd (1968),[30] what is required here is not "specific and detailed findings and conclusions of the kind customarily as-

---

to 10 November 1971 will receive the rate treatment prescribed in Orders 410 and 410–A, 3) New York opposes the determination in Order No. 441 that specified advance payments to pipeline affiliates shall be treated the same as similar advances to independent producers as "unlawful," and 4) New York raises the possibility of circumvention of the Commission's intent in regard to the limitations imposed on advance payments for purposes of rate treatment. See Order of Clarification and Denial of Rehearing or Modification in Docket No. R–411, issued 7 January 1972, at 1–2.

20. Brief for New York, at 17.

21. *Id.*, at 19.

22. See Southern Louisiana Area Rate Cases v. FPC, 428 F.2d 407, 437 (5th Cir. 1970), cert. den. 400 U.S. 950, 91 S.Ct. 241, 27 L.Ed.2d 257 (1970).

23. See *supra*, notes 5, 10, and 11 and accompanying text.

24. 15 U.S.C. § 717o (1963).

25. See Brief for Respondent, at 6ff.

26. 5 U.S.C. § 553(b) and 553(c) (1967).

27. See Appendix, at 1–3.

28. *Id.*, at 2–3.

29. 5 U.S.C. § 553(c).

30. 132 U.S.App.D.C. 200, 407 F.2d 330.

sociated with formal proceedings," but merely a concise general statement of the basis and purpose of the rule(s).[31] We expect that such a "concise general statement of * * * basis and purpose" will enable a reviewing court "to see what major issues of policy were ventilated by the informal proceedings and why the agency reacted to them as it did." [32] In *Automotive Parts & Accessories Association* we held that a statement that "This standard specifies requirements for head restraints to reduce the frequency and severity of neck injury in rear-end and other collisions," met these tests. Similarly, we find here that the statements made in Order 410, and in the Notice of Proposed Rulemaking, are quite satisfactory in that they explain the FPC's action in light of the gas shortage and the need for additional capital for development by the gas producers.[33] We thus find that there is an adequate basis for the FPC's new rules on advance payments.

In addition to the adequacy of basis for the FPC's action under Section 4(b) of the APA, there is another aspect of the present situation that would compel us to uphold the determination of the FPC that certain advance payments by pipelines may be entered into the rate base. We read the three orders, 410, 410–A, and 441, as an on-going effort by the FPC to determine experimentally the proper solution with regard to advance payments to help alleviate the gas shortage. We are impressed with the fact that the FPC has demonstrated a willingness to assimilate criticism from parties such as New York, and adjust its treatment of advance payments to conform with the realities of the natural gas market. This is perhaps best demonstrated by the FPC's comments which accompanied its decision in Order 441 to *remove* advance payments *for exploration and lease acquisition* from the rate base:

> Our review of the various comments and available data has persuaded us that advances for exploration and lease acquisition have not shown to be an effective vehicle for stimulating the widespread participation in natural gas production for which their encouragement was intended. Moreover, there is some indication that the availability of advances for such purposes by creating competition among pipelines to make such advances may be having the effect of increasing the amounts expended on lease acquisition without a proportionate improvement in gas supply.[34]

■ It appears to us that what the FPC is attempting to do in this area is to reach an accommodation of conflicting interests, through experimentation, that will result in the proper alleviation of the gas shortage. In doing so we think that the FPC is making policy decisions of the type it was created to make, and we are reluctant to disturb them.[35] In this very difficult area of rate-making, when it is uncertain what will be the ultimate agency determination, and when it is as yet unknown what will be the results and ramifications of the experimental policies adopted by the agency, we feel that the FPC has demonstrated, as adequately as can be expected under the circumstances, the basis for its actions, and we may thus defer to the expertise of the FPC in this matter.[36]

31. 132 U.S.App.D.C., at 207, 407 F.2d at 337.

32. 132 U.S.App.D.C., at 208, 407 F.2d, at 338.

33. See *supra*, text accompanying notes 5, 10, and 11.

34. Order 441, p. 5.

35. Though this is not precisely the same situation insofar as the doctrine of primary jurisdiction is applicable, since the resolution of the issues here has become somewhat more definite, the need for experimentation here, and our reluctance to disturb the policy judgment of the agency is similar to that in our recent decision in Delta Air Lines, Inc. v. C.A.B., 147 U.S.App.D.C. 272, 455 F.2d 1340 (decided 1 December 1971).

36. See Permian Basin Area Rate Cases, 390 U.S. 747, 771–772, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968); New York v.

## B. *The Determination that Pipelines May Make Advance Payments to Producers*

■ The thrust of New York's argument here is that it is impermissible for the FPC to have authorized the pipelines to make advance payments to producers before it has passed on the two producer-rate cases where the validity of such advance payments is an issue.[37] In other words, it appears that New York argues that the FPC may not say that it is permissible for the payor to make the payment before it holds that the payee may receive it. This argument has a certain amount of logical appeal, but the argument ignores the realities of the situation.

We think that the three orders, 410, 410–A, and 441, do indeed show that the FPC has arrived at the conclusion that in principle it is legal for both the payor to pay and the payee to receive. This does not necessarily affect the determination in the two pending producer-rate cases, which may finally turn on considerations unique to those two companies. Further, for reasons which are elaborated *infra,* we do not accept New York's argument that there is not another opportunity available for a challenge to the advance payments in the conventional pipeline rate proceedings which must take place for each particular advance payment arrangement under 15 U.S.C. §§ 717c and 717d (1963).

We regard the three orders as "the fashioning of policies, remedies, and sanctions, . . . in order to a·ive at maximum effectuation of Congressional objectives," and in such activity the breadth of agency discretion is at its zenith.[38] It appears that the statutory scheme of the Natural Gas Act is set up in such a way that challenges to the determinations of the FPC in a rulemaking proceeding such as the case at bar stand much less of a chance, when faced with the breadth of the agency's discretion, than they would in an individual rate proceeding where the scope of the agency's discretion is much more limited.

Similarly, it appears clear that if the FPC wishes to proceed with separate regulatory proceedings and determinations for pipelines and producers, there is authority for such a scheme. We take this to be the meaning of the comment of the Supreme Court in the *Permian Basin Area Rate Cases* (1968), that "the Commission is empowered, for purposes of its rules and regulations, to 'classify persons and matters within its jurisdiction and prescribe different requirements for different classes of persons or matters. . . ." [39]

New York has argued that even if it retains the right to challenge individual pipeline certificate proceedings, it will do the New York consumers no good "once that the horse has got out of the barn," and advance payments have been declared permissive in principle.[40] New York maintains that even if it succeeds in defeating advance payments in certificate proceedings in its area, the gas of the producers will then be sold to pipelines in other areas, where the producers will be able to secure the advance payments which they are now permitted, in principle, to receive.

■ At this stage this argument is speculative, but even if it were not, though we might feel sympathy for the plight of the New York consumers who would be forced to condone advance payments or survive without gas, this alone would not be grounds to overrule the de-

United States, 331 U.S. 284, 67 S.Ct. 1207, 91 L.Ed. 1492 (1947) ; 2 K. Davis, Administrative Law Treatise 475–476 (1st ed. 1958).

37. The two proceedings to which New York refers are El Paso Natural Gas Co., FPC Docket No. CP 66–306, and Shell Oil Company, FPC Docket No. CI 66–897.

38. Niagara Mohawk Power Corp. v. FPC, 126 U.S.App.D.C. 376, 382, 379 F.2d 153, 159 (1967).

39. 390 U.S. 747, 787, 88 S.Ct. 1344, 1370, 20 L.Ed.2d 312.

40. Brief for New York, at 22–24.

termination of the FPC that advance payments may be allowed. As we have stressed, by determining that advance payments may be made and entered into the rate base by the pipelines the FPC has made an allocation between competing interests (here the interests of the consumers in keeping the rates low and the interests of the producers—and, indeed, ultimately the consumers—in having more capital available for development of gas production capabilities) which we may not disturb unless there has been an abuse of agency discretion.

We can find no authority cited by New York that shows the FPC to have engaged in such illegal conduct. New York appears to place great reliance on the *CATCO* case, Atlantic Refining Co. v. Public Service Commission (1959),[41] which it cites for the proposition that "sterile contentions" will not be upheld.[42] Whatever the authority of *CATCO*, it does not apply here. In *CATCO* the Supreme Court announced that "Our examination of the record . . . indicates that there was insufficient evidence to support a finding of public convenience and necessity prerequisite to the issuance of the permanent certificates," and further "nor do we find any support whatever in the record for the conclusory finding on which the order was based that 'the public served through the Tennessee Gas system is greatly in need of increased supplies of natural gas.' "[43] In the case at bar we do not have a certificate proceeding, we have a rulemaking proceeding, and far from the situation in *CATCO*, where it was uncertain whether the gas in question was really needed, we have here a demonstrated crisis in the gas supply.

We thus uphold the FPC's determination in the orders that are here under attack that, in principle, advance payments, under certain circumstances, may be made by pipelines to producers, and that decision necessarily assumes the right of a recipient to receive it under proper circumstances. We do not, of course, reach any determination of the propriety of any particular advance payment which may be challenged in a conventional pipeline rate proceeding under 15 U.S.C. § 717.

## II. *Remaining Arguments*

The second and third issues pressed by New York do not require extended discussion. These arguments are concerned with some of the particular aspects of the method which the FPC has chosen to implement its scheme for alleviating the gas shortage. We find the language in the *Permian Rate Cases* dispositive of these questions:

. . . we have heretofore emphasized that Congress has entrusted the regulation of the natural gas industry to the informed judgment of the Commission, and not to the preferences of reviewing courts. A presumption of validity therefore attaches to each exercise of the Commission's expertise, and those who would overturn the Commission's judgment undertake "the heavy burden of making a convincing showing that it is invalid because it is unjust and unreasonable in its consequences." . . . We are not obliged to examine each detail of the Commission's decision; if the "total effect of the rate order cannot be said to be unjust and unreasonable, judicial inquiry under the [Natural Gas Act] is at an end."[44]

As we have shown, we are convinced that the "total effect of the rate order" is a reasonable attempt to increase the available capital for development of gas production, which, under the circumstances of the present gas shortage, we find to be a valid exercise of the

41. 360 U.S. 378, 79 S.Ct. 1246, 3 L.Ed.2d 1312.

42. See New York Reply Brief, at 2; New York Brief, at 17.

43. 360 U.S., at 392, 393, 79 S.Ct. at 1255–1256.

44. 390 U.S. at 767, 88 S.Ct. at 1360.

discretion of the FPC. We thus do not feel called upon to question the particular means that the FPC has chosen to effectuate its plan, and in light of the temporary nature of the FPC's scheme, and its ongoing experimental character,[45] we do not feel that New York has met "the heavy burden of making a convincing showing that it is invalid because it is unjust and unreasonable in its consequences."

■ Perhaps the most that New York has been able to demonstrate is that certain provisions of the FPC's new rules (and by no means all of them) favor the interests of the pipelines and the producer in increasing the gas supply at minimum cost to them, at the expense of a higher rate for the New York consumers. It appears to us that, in light of its particular expertise in the area, the FPC has determined that this is the best way to ensure that the necessary capital for development will be forthcoming. Even on its face this is not unreasonable, since ultimately the consumers must be ready to shoulder the costs of such operations, if they are necessary to supply them with power. This is so because under the due process clause of the Constitution no public utility could be compelled to absorb its own costs and not pass them on to the consumer.

■ The Federal Power Commission's primary mission under the Natural Gas Act is to protect the consumer, though it must also strive to reach a balance between the consumer, producer, and those whose interests fall in between.[46] In rate-making under the Natural Gas Act, the intent of Congress was that gas should be sold at the lowest possible reasonable rate consistent with the maintenance of adequate service in the public interest.[47] The Commission has decided that the public interest in enlarging the field supply of natural gas, needed for existing facilities and contracts, warrants the modest acceleration of expense inherent in advance payments. It may well be that the way the Commission has now chosen is ultimately the least expensive way for the consumer. Because of the presumption of validity which the *Permian Rate Cases* tell us attaches to such an exercise of the Commission's expertise, we decline to disturb the rulemaking which is here challenged.

The decisions of the Federal Power Commission in the orders appealed from are

Affirmed.

## ON PETITION FOR REHEARING

## PER CURIAM:

The Public Service Commission of the State of New York has requested us to

---

45. This experimental character is exemplified by the difference between the treatment of advance payments for exploration and lease acquisition accorded by the three orders. We note in passing that except for the very limited time period between orders 410–A and 441, the issue of advance payments for exploration and lease acquisition purposes as rate base items, raised by New York in its second argument, is mooted by order 441, which removes them from the rate base. As for the advance payments for exploration and lease acquisition which may have gone into the rate base during the interim period before order 441, we would not disturb these, even though the Commission has decided that this will not be permitted in the future, since such anomalies are to some extent unavoidable when the Commission must proceed by trial and error, as we think it has had to do in the case at bar.

46. Mesa Petroleum Co. v. FPC, 441 F.2d 182, 186 (1971) (5th Cir. 1971).

47. Cincinnati Gas & Electric Co. v. FPC, 389 F.2d 272, 276 (6th Cir. 1968); Atlantic Refining Co. v. FPC, 115 U.S. App.D.C. 26, 316 F.2d 677, 678 (1963); *see also* FPC v. Natural Gas Pipeline Co., 315 U.S. 575, 585, 62 S.Ct. 736, 86 L.Ed. 1037 (1942); Lynchburg Gas Co. v. FPC, 119 U.S.App.D.C. 23, 336 F.2d 942 (1964) (concurring opinion).

reconsider our opinion of 29 March 1972 affirming the orders of the Federal Power Commission. We hereby deny New York's petition for rehearing; however, we believe a short statement in explanation of our action is appropriate.

 One of the important factors in reaching our decision was the temporary character of the FPC order under review (Order 441 remains in effect only through 31 December 1972), and our belief that it represented a justifiable experiment in the continuing search for solutions to our nation's critical shortage of natural gas. See opinion at 367–368, 369–370. The principal justification for allowing rate base capitalization of advance payments made by the pipeline companies—and the implicit approval in principle of such payments to producers —was to provide additional capital to producers to stimulate exploration and development activities that would result in easing the gas shortage. Fundamental to the concept of any experiment is the assumption that the data developed from the experience thereunder will be subjected to meaningful review, analysis, and evaluation before the experimental practice is allowed to continue or to become institutionalized as a more permanent procedure.

In approving this temporary order, we had no intention of abridging that concept nor of approving capitalization of advance payments beyond its stated expiration date without the FPC having first carefully evaluated the experience under Order 441 to determine whether its justifying objectives are being satisfactorily met at an acceptable level of ultimate economic cost to the nation's gas consumers. We would accordingly expect that the FPC will not continue, or extend the effective date of, the practices authorized by Order 441 without further proceedings in which New York and all other interested parties will be given the opportunity to demonstrate the effectiveness or the futility of this experiment.