## PROCESS GAS CONSUMERS GROUP, Petitioner,

v.

## FEDERAL ENERGY REGULATORY COMMISSION, Respondent,

American Gas Association, Interstate Natural Gas Association of America, Fertilizer Institute, Gas Research Institute, Georgia Industrial Group, Intervenors.

No. 88–1109.

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 8, 1988.

Decided Jan. 27, 1989.

William H. Penniman, Washington, D.C., for petitioner.

Samuel Soopper, Atty., F.E.R.C., with whom Catherine C. Cook, General Counsel, and Joseph S. Davies, Deputy Sol., F.E.R.C., were on the brief for respondent.

Hanford O'Hara, Atty., F.E.R.C., Washington, D.C., also entered an appearance for respondent.

David J. Muchow, John H. Cheatham, III, James M. Broadstone, Frank X. Kelly and Peter C. Lesch, Washington, D.C., were on the joint brief for intervenors.

Carol A. Smoots entered an appearance for intervenor, American Gas Ass'n.

Edward B. Myers, Washington, D.C., entered an appearance for intervenor, Interstate Natural Gas Ass'n of America.

Stephen A. Herman, Washington, D.C., entered an appearance for intervenor, Fertilizer Institute.

Edward J. Grenier, Jr., Washington, D.C., entered an appearance for intervenor, Georgia Industrial Group.

Before: RUTH BADER GINSBURG and SILBERMAN, Circuit Judges, and FLOYD R. GIBSON,* Senior Circuit Judge, United States Court of Appeals for the Eighth Circuit.

Opinion for the Court filed by Circuit Judge SILBERMAN.

SILBERMAN, Circuit Judge:

The Process Gas Consumers Group ("PGC") seeks review of an order of the Federal Energy Regulatory Commission approving a natural gas rate surcharge to support the 1988 research, development and demonstration budget of intervenor Gas Research Institute ("GRI"). Among other challenges, PGC asserts that a substantial portion of GRI's 1988 budget is devoted to the investigation of "end use" gas applications not likely to benefit ratepayers and thus outside FERC's jurisdictional mission. We are persuaded that the Commission has failed to apply the proper legal standard in determining whether GRI's projects "[have] a reasonable chance of benefitting the ratepayer in a reasonable period of time," 18 C.F.R. § 154.38(d)(5)(iii)(d) (1988), and therefore we grant the petition for review and remand the case to FERC for further agency proceedings.

## I.

Under the Natural Gas Act and pursuant to its cost-of-service ratemaking principles, FERC permits regulated pipelines to recover from ratepayers the costs of performing certain research, development and demonstration ("RD & D") projects related to jurisdictional sales and distribution of gas. *See generally id.* § 154.38(d)(5). In order to encourage industry support for such research efforts, the Commission allows regulated companies to petition for advance Commission assurance of the recoverability, for ratemaking purposes, of contribu-

tions to collaborative industry research organizations and consortia, and to permit the organizations and consortia themselves to seek direct Commission approval of their research agendas. 18 C.F.R. § 154.38(d)(5) (1988); *see Order Prescribing Changes in Accounting and Rate Treatment for Research, Development and Demonstration Expenditures,* 58 F.P.C. 2238 (1977). Under these procedures, FERC's approval of an RD & D organization's annual budget constitutes, in turn, advance approval of the regulated companies' anticipated contributions to the organization. Intervenor GRI, one such collaborative RD & D organization, for over 10 years has supported RD & D activities on behalf of natural gas pipeline and distribution companies. Originally funded through the contributions of member companies, GRI since has obtained financing more or less exclusively via direct FERC-approved surcharges on jurisdictional throughput, *i.e.,* gas supplies delivered through regulated pipelines to consumers. These surcharges have grown from 0.12 cents per Mcf (1000 cubic feet) in 1978 to approximately 1.51 cents per Mcf today.

To enable FERC to make an intelligent assessment of research initiatives submitted for advance approval under these procedures, Commission regulations require jurisdictional companies and research organizations to include in their submissions, *inter alia,* "[e]vidence that the project or program ... has a reasonable chance of benefitting the ratepayer in a reasonable period of time" and that "whatever achievements may result ... will accrue to the benefit of the sponsoring jurisdictional compan[ies] and [ ] their customers." 18 C.F.R. § 154.38(d)(5)(iii)(d) & (e) (1988). When passing on proposed initiatives, FERC, however, maintains "due regard [for] the basic, exploratory or applied nature of each submitted RD & D project." *Id.* § 154(d)(5)(iii)(d).

In the summer of 1987, GRI filed its latest 1988 budget and five-year research

---

* Sitting by designation pursuant to 28 U.S.C. § 294(d).

plan.[1] The submission called for $175 million in outlays to be financed by a 1.59 cents per Mcf surcharge on regulated sales and transportation services. Of the approximately $150 million earmarked for "contract R & D obligations," GRI proposed to devote over $82 million (56% of the research budget) to so-called "end-use" applications, including "selected new consumer options and end uses of gaseous fuels that have the potential of offering substantial economic and other advantages over existing and prospective [energy] alternatives...." The Commission promptly directed its staff to perform a comprehensive review of the application and invited public comments.

FERC partially adopted[2] the staff's recommendations and approved the 1988 GRI budget reflecting a 1.51 cents per Mcf surcharge on jurisdictional throughput, a .08 cents per Mcf reduction in GRI's proposed surcharge. It also approved GRI's 1988–92 R & D plan subject to a condition that the surcharge in years two through five not exceed the 1988 level. *See Gas Research Institute*, 40 F.E.R.C. ¶ 61,363, *reh'g denied*, 41 F.E.R.C. ¶ 61,314 (1987). Over the objections of PGC, the Commission rejected proposals to impose mandatory manufacturer cofunding requirements, to require increased GRI reliance on royalty income from successful projects, and to direct GRI to use low-interest loans to stimulate research rather than grants. *See* 40 F.E.R.C. at 62,101, 62,109–10. The Commission rebuffed PGC's primary contention that the portion of GRI's budget devoted to end-use applications did not involve legitimate RD

& D within jurisdictional boundaries, relying on this court's decision in *Public Util. Comm'n of Colorado v. FERC*, 660 F.2d 821 (D.C.Cir.1981), *cert. denied*, 456 U.S. 944, 102 S.Ct. 2009, 72 L.Ed.2d 466 (1982). *See* 40 F.E.R.C. at 62,111–12.

PGC filed a timely application for rehearing accusing the Commission on a number of grounds of inadequate review and arbitrary approval of the GRI budget. *See Gas Research Institute*, 41 F.E.R.C. ¶ 61,314 (1987) (order on rehearing). Besides objecting to FERC's acceptance of numerous specific projects, PGC repeated its case for the imposition of certain "self-policing" mechanisms (such as manufacturer cofunding and greater reliance on royalty income) to force GRI to tailor its program to those initiatives promising the best return to ratepayers. PGC asserted that such mechanisms were necessary given FERC's lack of expertise in making judgments about the soundness and promise of particular research projects. PGC also renewed its fundamental objection to GRI's research into end-use applications designed to expand the markets for natural gas, arguing that *Colorado*'s apparent acceptance of the propriety of end-use research was limited to those projects that have "as their broad goal the conservation of gas supplies."

FERC denied PGC's request for rehearing in its entirety. In response to the end-use objection, the Commission asserted that *Colorado* "stands for the general principle that the Commission has ... authority to permit RD & D projects for development

---

1. FERC has traditionally required RD & D organizations annually to submit not only their proposed expenditures for the coming year but also a five-year projection of research initiatives and expenditures. FERC requires this latter outyear information to assess more thoroughly the overall objectives of organizational programs. *See* 18 C.F.R. § 154.38(d)(5)(iii) (1988); *Order Prescribing Changes in Accounting and Rate Treatment*, 58 F.P.C. at 2243–44. Nevertheless, the Commission's approval in any given year of the second through fifth years of a research plan is only tentative, and is subject to plenary review when FERC entertains the relevant annual budget later on. *See* 18 C.F.R. § 154.38(d)(5)(iv); 58 F.P.C. at 2244.

2. Commission staff suggested a 1.51 Mcf surcharge, but based its recommendation on the proposed adoption of a 10–unit limit on field tests for technology applications, a suggested 50–percent manufacturer cofunding requirement for those field tests, and the elimination of two specific projects—the Climate Prediction Model and the Siljan Crater Project. The Commission more or less accepted the proposed 10–unit limitation on field tests and the elimination of the two specific projects, but rejected the cofunding requirement with an admonition to GRI that it "show demonstrable improvement in the future." *See Gas Research Institute*, 40 F.E.R.C. ¶ 61,363 at 62,096–97, 62,101, 62,105–07, *reh'g denied*, 41 F.E.R.C. ¶ 61,314 (1987).

of end-use concepts whenever appropriate."
*Id.* at 61,834. The Commission concluded:

[G]as-related research continues to be needed despite changed circumstances in the industry, and GRI has been responsive to those circumstances in planning its RD & D. GRI's focus will conserve natural gas and lower consumer costs through more efficient use of the commodity. Furthermore, GRI stated that the bolstering of natural gas markets will benefit ratepayers through the lower unit costs resulting from wider distribution of fixed costs and more efficient operation of natural gas systems.

*Id.* This petition for review followed.

## II.

As noted, once before in *Colorado* we considered a challenge to Commission approval of a GRI budget submission. Because the issues raised in the earlier case and in the petition before us are related, we begin by analyzing the principles that guided the *Colorado* opinion.

*Colorado* involved a more or less frontal assault on FERC's approval of the 1980 GRI R & D budget and 1980–84 R & D plan, a budget which, like its 1988 counterpart, included numerous consumer appliance, industrial application, and synthetic or alternative fuel supply initiatives. *See Colorado,* 660 F.2d at 825. The petitioners there disputed FERC's jurisdiction to approve the funding of any research that strayed beyond investigation into "the production, transportation or sale of natural gas in interstate commerce," narrowly defined. *Id.*[3] The petitioners thought dispositive this court's rejection in *Office of Consumers' Counsel v. FERC,* 655 F.2d 1132 (D.C.Cir.1980), of an attempt by FERC to authorize ratepayer financing of a large-

scale commercial coal gasification demonstration plant as being outside the Natural Gas Act's jurisdictional boundaries.

■ Nevertheless, we had little difficulty in affirming FERC's approval of the ostensibly extra-jurisdictional end-item and alternative fuel supply research proposed in *Colorado.* We noted that "all [of the challenged research projects] have as their broad goal the conservation of dwindling gas supplies," 660 F.2d at 825, either through new technologies designed to assist consumers in reducing their consumption of gas or through development of alternative energy sources that would mitigate pressures on natural gas supplies. *See* id. at 825–26. Refusing to draw the Act's jurisdictional lines as narrowly as petitioners suggested, we said:

To limit research projects to the production or transportation of natural gas would not only be unduly restrictive, but would ignore the reality that natural gas supplies are being exhausted and are not renewable. In order to make natural gas available in the future, some sort of conservation must be exercised and the best alternatives studied and selected.

*Id.* at 828. Since the probable effect of successful GRI projects in that case would have been a reduction in gas prices (occasioned by reduced consumer demand or enhanced natural gas supplies), we thought it clear that the ratepayers being "taxed" to support GRI's research efforts would be benefitted. *See id.* at 827–28. In other words, because the subject research was designed to "assur[e] ... an adequate and reliable supply [of natural gas] *at reasonable prices," id.* at 828 (emphasis added), the research was within FERC's jurisdiction to approve.[4] Thus, FERC, consistent with the Natural Gas Act, may authorize

---

**3.** The court was also presented with a challenge to FERC's basic authority to regulate the affairs of an entity that was not a "natural gas company" within the meaning of the Act. Because GRI was acting on behalf of and in substitution for jurisdictional companies, the court rejected the argument. *See Colorado,* 660 F.2d at 824–25.

**4.** We distinguished *Office of Consumers' Counsel* as rejecting only "extensive [Commission] super-

vision" and certification of large-scale alternative energy production projects. *See Colorado,* 660 F.2d at 827; *see also Office of Consumers' Counsel,* 655 F.2d at 1147–48. Yet, in *Office of Consumers' Counsel* we were concerned not only with FERC's use of its certification powers to promote synthetic fuel production, but also with the use of its ratemaking powers for such purposes. *See Office of Consumers' Counsel,* 655 F.2d at 1147–49 & n. 32.

ratepayer financing of end-item research that has as its "broad goal" the purpose of "keeping consumer rates down." In *Colorado*, however, we did not confront the sort of challenge PGC presents here. In the earlier case, the petitioner disputed whether GRI's end-item research agenda bore some reasonable connection to the future *jurisdictional* sale of gas; the court and petitioner simply assumed that the projects, if successful, would bring benefits to ratepaying consumers in the form of reduced gas bills. *See* 660 F.2d at 828. In our case, by comparison, we understand petitioners to have assumed the requisite connection to a future jurisdictional sale,[5] and instead to question whether the fruits of GRI's 1988 research will actually work to the benefit of ratepayers—*e.g.*, whether their gas bills will be reduced. We think this latter question is equally important to the issue of FERC's statutory authority to sanction ratepayer financing of the research.

█ When considering whether a proposed research project "has a reasonable chance of benefitting the ratepayer in a reasonable period of time," 18 C.F.R. § 154.38(d)(5)(iii)(*d*), the Commission need not undertake scientific "peer review" or otherwise attempt to determine with precision whether the efficiency gains from an end-use application will outweigh the costs to ratepayers of the research. It is enough for the Commission rationally to conclude that the research contemplated is *by its nature* likely to benefit ratepayers if successful. That is, in addressing challenges akin to those advanced by petitioner, FERC need only make a reasoned judgment that the general objectives of the research are themselves consistent with the interests of ratepayers. In this connection, we reject petitioner's assertion that FERC must engage in extended, detailed analyses of the precise costs and benefits of particular projects. We think the Commission correctly believes that the speculative nature of research is ill-suited to petitioner's suggested pure accounting approach. *See Public Serv. Co. v. FERC*, 832 F.2d 1201,

1215 (10th Cir.1987). Still, even under a comparatively circumscribed delineation of the Commission's responsibility in this area, we believe FERC failed to confront and address rationally petitioner's concerns about the nature of some of GRI's end-item research.

PGC's claim that GRI's research program as presently fashioned is not likely to benefit ratepayers is founded on two notions. First, PGC observes that conditions in the market for natural gas have fundamentally changed since FERC's approval of a similar GRI budget was sustained by this court in 1981. No longer is the market supply-driven; Congress' phased deregulation of wellhead prices in 1978, *see* Natural Gas Policy Act of 1978, 15 U.S.C. §§ 3301–3432 (1982), and other factors have led to market conditions characterized by abundant supplies. Alone, of course, this observation is not conclusive. Just because the natural gas market now favors buyers does not mean that additional conservation efforts will fail to yield incremental price reductions to consumers by softening demand even more. PGC further argues, however, that these changes in natural gas market conditions have induced correlative changes in GRI's goals, so that a substantial portion of GRI's end-item budget is now slated for projects aimed at generating *new* demand for natural gas. To make matters worse, GRI is allegedly proposing to concentrate these efforts on developing new consumer and industrial uses of gas that are highly dependent upon the gaseous form of the product ("form value"), *i.e.*, uses that do not easily accommodate a shift to alternative fuels.

The economic implications of these GRI initiatives, according to PGC, cannot be considered favorable to ratepayers. Should GRI generate new consumer demand through its ratepayer-financed efforts, basic principles of economics suggest that the wellhead price of natural gas will rise, other factors remaining constant. If this new demand is concentrated in consumer and industrial applications sensitive

---

5. To the extent PGC challenges the existence of a connection to a future jurisdictional sale as

well, we think *Colorado* fairly disposes of the question.

to the form value of natural gas, moreover, it is probable that the constraining effect of the prices for alternative fuels on natural gas prices will be mitigated. In other words, as "captive markets" comprise an ever greater proportion of the total consumer demand for gas, the cross-elasticities of demand between gas and alternative fuels will decline, and this will hurt ratepayers as well. Petitioner accordingly argues that FERC arbitrarily decided that such research projects have "a reasonable chance of benefitting the ratepayer in a reasonable period of time." 18 C.F.R. § 154.38(d)(5)(iii)(*d*).

Our review of GRI's 1988 application supports the accuracy of petitioner's characterization of the GRI agenda. For instance, in its 1988–1992 Research and Development Plan, GRI projected an expenditure in 1988 of almost $19 million on so-called industrial end-use applications, "emphasiz[ing] development of new cost-effective uses of gas with higher form value than competing fuels." Other projects are designed to capitalize on the "form value" of gas in new markets as well, including research into gas-powered motor vehicles and emission control technology. Nearly $50 million is slated for residential and commercial applications aimed at "developing technologies that provide least-cost energy services in ... markets where gas is not currently the fuel of choice."

FERC's rejoinder to petitioner's end-use objection was that "GRI's focus will conserve natural gas and lower consumer costs through more efficient use of the commodity" (presumably by developing more efficient appliances). *Gas Research Institute,* 41 F.E.R.C. at 61,834. The Commission also relied, however, on GRI's representation "that the bolstering of natural gas markets will benefit ratepayers through the lower unit costs resulting from wider distribution of fixed costs...." *Id.* We understand this latter contention to mean that whatever effect GRI's develop-

ment of new markets may have on the *wellhead price* of natural gas, it will be offset by lower per-unit *transportation costs* through more complete use of existing pipeline capacity. Especially, but not exclusively, as to those projects designed primarily to create new markets in natural gas, we find this contention unpersuasive.

A similar argument concerning reduced per-unit transportation costs was advanced by FERC and rejected by this court in *Maryland People's Counsel v. FERC,* 761 F.2d 768 (D.C.Cir.1985). In that case, a group of captive natural gas customers objected to a Commission policy that extended the benefits of more vigorous price competition selectively to noncaptive customers, allegedly exposing the captive group to exploitation. FERC defended its policy by arguing that a broader base of natural gas customers would spread the fixed costs of the transportation system more widely and thus offset any anticompetitive effects. We thought that argument rather weak, however, since total transportation costs made up (at the time) only 15% of the average customer's gas bill, while gas costs accounted for the remaining 85%. 761 F.2d at 776. Absent reasoned findings suggesting otherwise, the Commission cannot therefore assume that hypothetical per-unit transportation cost savings will offset hypothetical increases in gas prices occasioned by fresh consumer demand for gas.[6]

The Commission's primary justification—that ratepayers will benefit from more efficient gas-using appliances—seems logically stronger, but it depends for its force on what group of ratepayers (and what types of gas uses) FERC is referring to. Given the broad objectives of GRI's research efforts, with some projects devoted to creating *new* gas demand and others designed to make more efficient *existing* applications, it would appear that two more or less distinct classes of consumers may realize efficiency gains—those currently employ-

---

6. We note that even apart from the probability of demand-driven price increases outstripping per-unit reductions in transportation costs, FERC made no finding regarding the degree to which there exists excess capacity in the pipe-

line system. If available pipeline capacity is already under full utilization, new consumer demand might require ratepayer financing and construction of additional transportation networks.

ing natural gas in some manner who replace their present appliance with a more efficient device developed with GRI's assistance, and those who, by purchasing an appliance developed through GRI's efforts, switch from an alternative fuel to natural gas.[7] FERC apparently considers both categories of efficiency gains to justify the research costs, but we have grave doubts about the latter.

To illustrate our concern, suppose GRI submitted for FERC approval a research project that would cost existing gas consumers a great deal, but if successful would enable 50 percent of the current residential consumers of electricity to switch efficiently to the exclusive use of gas. However public-spirited the project may appear under the circumstances,[8] we think it would be manifestly unfair and improper to saddle current ratepayers with the bill for such research. It is true that RD & D financing is one of those unusual settings in which it is appropriate for FERC to authorize "the charging to current ratepayers of expenditures incurred by a jurisdictional company" even though the fruits of those expenditures may flow to future ratepayers. *Office of Consumers' Counsel v. FERC,* 655 F.2d 1132, 1149 n. 32 (D.C.Cir.1980); *see also Mobil Oil Corp. v. FPC,* 417 U.S. 283, 320, 94 S.Ct. 2328, 2351, 41 L.Ed.2d 72 (1974) (upholding Commission's authority to charge current ratepayers for investment in development of future supplies); *Tennessee Gas Pipeline Co. v. FERC,* 606 F.2d 1094, 1109–14 (D.C.Cir.1979) (discussing Commission policy allowing customer surcharges for purposes of gas exploration), *cert. denied,* 445 U.S. 920, 100 S.Ct. 1284, 63 L.Ed.2d 605 (1980); *but cf. id.* at 1109–10 & n. 53 (describing "general practice" of Commission limiting rate base to items "used and useful" in providing regulated services). In certain circumstances, then, it is proper for

FERC to charge existing ratepayers with the costs of a project, the benefits of which *all* future ratepayers will enjoy. It is quite another concept, however, to charge existing ratepayers with a cost that not only brings no benefit to them but, rather, may or will imply future detriment. That seems more like taxing the Colonies to support the occupying British army. We do not read the Natural Gas Act to permit FERC to empower regulated companies to conduct a ratepayer-financed excursion into the markets dominated by alternative fuels. Taxing current ratepayers for such efforts to expand demand is inconsistent with Congress' mandate that "gas should be sold at the lowest possible reasonable rate consistent with the maintenance of adequate service in the public interest." *Public Serv. Comm'n v. FPC,* 467 F.2d 361, 370 (D.C. Cir.1972); *see also FPC v. Natural Gas Pipeline Co.,* 315 U.S. 575, 585–86, 62 S.Ct. 736, 742–43, 86 L.Ed. 1037 (1942).

■ When determining whether end-item research of the character proposed "has a reasonable chance of benefitting the ratepayer in a reasonable period of time," FERC, we think, is required to find that the research, if successful, will on balance work to the benefit of existing classes of ratepayers—those customers paying for the research in the first place. On the benefit side of the equation, FERC may include all economic gains that might inure to existing classes of ratepayers through the employment of gas-saving devices, thus excluding those efficiency gains that flow to consumers who switch to gas by reason of ratepayer-financed research. On the cost side, FERC not only must account for the initial expense of the research but also must make a rational judgment about the probable economic effect of the research, if successful. FERC must at least consider

---

7. It does not appear from the record that ratepayers, in significant proportion, straddle the categories, *i.e.,* currently use natural gas for one purpose but a different fuel, from which they might switch as a result of GRI's projects, for another purpose. *See* Joint Appendix at 689 (relatively few existing ratepayers projected to purchase end-use products).

8. If switching is promoted solely by reason of making new gas-saving technology available to consumers at artificially low prices (because of subsidization of development costs by captive gas consumers), it is not necessarily the case— as FERC apparently assumes—that net *energy* consumption will decline.

whether a project is intended to create a new market for gas among present consumers of an alternative fuel, and whether that new demand is likely to work to the disadvantage of existing ratepayers by pushing up gas prices. FERC's failure to perform this analysis—to consider all of the factors we have described—makes its decision arbitrary and capricious.

We reiterate that FERC, in making these judgments, need not engage in painstaking cost-benefit analysis of the merits of research proposals on a project-by-project basis. Rather, the Commission is required to make only a candid, common-sense assessment as to the consistency of a project's objectives with the interests of the ratepayers providing the financing. FERC's mandate to determine "just and reasonable" rates requires no less. 15 U.S.C. § 717d(a) (1982).

### III.

We recognize that the Commission will be faced with numerous "close calls" in scrutinizing proposed research under this framework, and thus believe considerable deference must be paid FERC in the exercise of its discretion in this area. At the extremes, of course, the Commission's inquiry should not prove especially difficult. For instance, a project that is aimed at creating captive gas demand in a market exclusively controlled by an alternative fuel promises little or no efficiency benefits to the financing ratepayers, and holds the prospect of demand-driven price increases for existing classes of ratepayers to boot. The Commission would face a heavy burden in justifying ratepayer financing of research of this sort. At the other end of the spectrum, a proposal designed to fabricate a more efficient gas-consuming device in a market presently dominated by natural gas promises both efficiency gains and the possibility of reductions in the wellhead price of gas. The bulk of the projects,

nevertheless, may fall between the extremes, and FERC is entitled to substantial deference in its review and classification of these projects provided it reasonably addresses the considerations set out above.[9]

\*   \*   \*   \*   \*   \*

For the reasons stated, we vacate the order under review and remand the case to FERC for further proceedings consistent with this opinion.

---

9. In part because a substantial percentage of the research projects submitted by GRI for Commission approval falls within this middle category, and because we must in any event remand the case to FERC for application of the proper legal standard to GRI's research program, we decline at this time to consider petitioner's alternative arguments in support of "surrogate" Commission management techniques—mandatory manufacturer cofunding, increased reliance on royalty income, and the like.